# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00260-CR

**David Perez, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT
### NO. 005440, HONORABLE JON N. WISSER, JUDGE PRESIDING

## O P I N I O N

Appellant David Perez appeals his convictions for aggravated sexual assault of a child and indecency with a child by contact. *See* Tex. Pen. Code Ann. §§ 22.021(a)(1)(B), 21.11(a) (West 2003).[1] After the jury found appellant guilty of both offenses, the trial court assessed punishment in each case at six years' imprisonment.

## Points of Error

Appellant advances five points of error. First, appellant contends that the trial court erred in admitting the testimony of Robin Beauregard under the medical diagnosis and treatment

---

[1] The current code is cited for convenience.

exception to the hearsay rule. *See* Tex. R. Evid. 803(4). Second, appellant urges that the trial court erred in admitting the testimony of Dr. William Lee Carter because the proper predicate for expert testimony was not laid. *See* Tex. R. Evid. 702. Third, appellant claims that the trial court erred in overruling the motion for a new trial. Fourth and fifth, appellant asserts that the evidence is factually insufficient to support the two convictions as alleged in the indictment.[2]

## Background and Facts

In order to place the issues in proper perspective a summary of the facts is essential. The case turns in large measure on the credibility of A.N., appellant's daughter and the complainant, who was twelve years old at the time of the February 2002 trial, having been born on November 14, 1989. After two years in shelters, foster homes, and treatment centers, A.N. testified to facts generally supportive of the indictment's allegations. She readily acknowledged that earlier she had denied the allegations and told conflicting stories to caseworkers, a doctor and others. There was testimony that other witnesses regarded her as a liar and a manipulator.

---

[2] Each count contained two paragraphs alleging different theories of aggravated sexual assault of a child and of indecency with a child by contact. The jury returned two separate general verdicts, one finding appellant guilty of aggravated sexual assault of a child "as alleged in Count I of the indictment" and one finding appellant guilty of indecency with a child by contact "as alleged in Count II of the indictment." When a general verdict is returned and the evidence is sufficient to support a finding of guilt under any of the paragraph allegations submitted, the verdict will be upheld. *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997); *Fuller v. State*, 827 S.W.2d 919, 931 (Tex. Crim. App. 1992); *Ketchens v. State*, 823 S.W.2d 256, 257-58 (Tex. Crim. App. 1991); *Roberson v. State*, 16 S.W.3d 156, 159 n.3 (Tex. App.—Austin 2000, pet. ref'd).

The record reflects that A.N. was born to appellant and a sixteen-year-old prostitute who was a crack cocaine addict, whom appellant had befriended. The mother left when A.N. was two weeks old. A.N. lived with her father in approximately seventeen places by the time she was ten years old. She had attended school irregularly. In 1997, appellant was convicted of injury to a child after he slapped A.N. He was placed on probation. A.N. was placed in a foster home. A.N. was returned to appellant in 1999. In January 2000, appellant was arrested for violation of probation. A.N. was taken into custody and placed in the Williams Shelter. In early February she was placed in the foster home of Dorothy Place. On February 23, 2000, A.N. was examined by Dr. Beth Nauert, a pediatrician, who had examined A.N. on February 12, 1997, when A.N. was first in foster home care. At that time, A.N. had dental cavities and head lice but her genital examination appeared normal. On the latter occasion, A.N. informed the doctor that she was being examined for a stomach ache and a runny nose. She volunteered to the doctor that her father (appellant) was in jail for child molestation, and that it was because when she was "seven" she had "a rash down there" and appellant kept cream on it, and that was all.[3] When asked if she had been touched or bothered, A.N. told Dr. Nauert that her "boyfriend" David and another boy, Santos, had had sexual intercourse with her. The genital examination was normal. The doctor explained that a normal genital exam does not rule out sexual abuse; that it is rare for a doctor to be able to say with certainty that a child has been sexually abused; that an exam may be normal even if there had been physical penetration; that

---

[3] A.N. was mistaken. Appellant was in jail at the time because of a probation violation.

3

an exam may even be normal if there had been multiple penetrations by different individuals assuming days or weeks had passed since the penetration; that even if an injury is inflicted, an examination some time after the assault may not reflect injury as lacerations often heal without noticeable scars; and that it is only when a child is pregnant or has a sexually transmitted disease, is there some proof that the child has been sexually molested.

Beth Arcotta, a mental health counselor under contract with a foster home agency, began therapy sessions with A.N. on February 15, 2000, at which time A.N. denied that appellant had molested her and said she did not know why she was in foster care. The sessions involved A.N.'s adjustments at the foster home and at school. Early on, A.N. told Arcotta that she had unwanted sex with five boys near her grandmother's house. In March, A.N. complained that her foster mother (Place) was pressuring her to admit that her father had molested her which she again denied. A.N. felt that her foster mother did not like her, but Arcotta stressed that it was A.N.'s failure to follow directions. A plan was devised for A.N. to follow directions and Arcotta promised her a sundae if her behavior improved. A.N. then focused on her relationship with her foster mother and how to please her with Arcotta's assistance. This all was discussed at a session May 7, 2000. The next night on May 8, Dorothy Place, the foster mother, called Arcotta and informed her that A.N. had made an outcry claiming her father had molested her. Arcotta talked to A.N., but assumed at the time that only "touching" was involved.

A.N. lived in the foster home of Dorothy Place where there were nine other foster children. Place testified that at first A.N.'s personal hygiene was inadequate; her clothes were too tight, too short, and too revealing; two pairs of shorts had one and a half inch holes in the crotch.

4

A.N. had in her possession some of appellant's "paperwork," a $100 bill in a plastic sandwich bag, and a pair of men's underwear which she placed under her pillow at night.

Place discovered A.N. "acting out" sexually in playing with dolls or dancing, simulating sexual positions. She danced around a pretended pole as if she was a topless dancer. A.N. told Place that her father had taken her to a strip club. A.N. touched the other children on their legs, openly masturbated, and "came on" to the boys in a sexual manner. On May 8, 2000, after a house meeting where some of the boys discussed their experiences, A.N. asked to speak to Place privately. She then made an outcry that her father had molested her. This was approximately four months after she had been removed from his home. Place had A.N. talk to Arcotta, and then took a written statement which A.N. signed. A videotape was made the next day.

Place tried to portray A.N. as being truthful, but admitted that A.N. did tell lies, although she was not the worst liar Place had ever had in her foster home. Place acknowledged that in the summer of 2000 A.N. falsely accused her of abuse by hitting. Other evidence showed that in 1997 A.N. had falsely accused her then foster mother of abuse.

Case worker Amy Thompson, Child Protective Services caseworker Anna Warde, counselor Robin Beauregard, psychotherapist Charles Cansler, and foster care workers Stefanio Arigo and Gene Foster all described A.N. as having no sexual boundaries, interacting in overt sexual behavior with anyone encountered. They also described A.N. as a liar.

The twelve-year-old A.N. testified in a mature manner. She had been raised by appellant. She saw little of her mother. Appellant taught her to be "good." When she was six, seven, or eight years old, appellant taught her that you are a good girl when you have sex with your

5

daddy or mommy; that he would french kiss her, have her watch R-rated movies, would buy her make-up, fingernails and thong underwear. A.N. wore tight clothes and stated her father put holes in the crotch of her shorts. She also reported that appellant taught her how to shoplift by wearing baggy pants, trying on merchandise and walking out of the store with the merchandise under her bagging garments while appellant distracted the store clerk.

A.N. testified that when she returned from her first foster home placement, appellant began to order that she have sexual intercourse with him and his friends; that she had sexual intercourse with appellant "Monday through Friday or Monday through Thursday." A.N. remembered one occasion when they were staying with her Aunt Eunice. Appellant came into the room where A.N. had been painting, pushed her papers aside, and put her on the bed and had intercourse with her. Appellant appeared mad and drunk. On another occasion, appellant had sexual intercourse with her on a couch and she scratched his face in the encounter. A.N. recalled another time when appellant had her perform an act of masturbation on him. A.N. said that appellant's friends paid fifty and sometimes one hundred dollars to have sex with her. Two of these individuals were brothers David, age twelve, and Santos, age nineteen. She conceded that David Santos was the name of her father's welding boss, but insisted that these were different individuals. A.N. acknowledged that despite all her sexual activity, she had never seen a man's penis.

A.N. admitted that she told conflicting stories to Arcotta, Place, and Dr. Nauert. She explained in part that she learned from Crystal, another girl at the Place's home, that it was not natural for daughters to have sex with their fathers contrary to what appellant had taught her. This made her angry and she made her outcry to Place. When asked on cross-examination if she told the

6

truth at the time of the outcry, at the time of the later videotape, and on direct examination, A.N. answered "Yes" to all three questions.

Dr. William Lee Carter, a psychologist, testified as an expert about symptoms and behaviors commonly seen in sexual abuse victims. In answer to hypothetical questions tailored to the facts of the instant case, Dr. Carter stated those facts indicated a sexually abused child.

Appellant's brother and sister were among the defense witnesses. Yvonne (Bonnie) Bunch testified that she and her children lived with appellant when A.N. was returned from foster care. Appellant had a cast on his broken leg at the time. Later, appellant and A.N. stayed with her in Waco. She saw nothing in their relationship that was unusual. Bunch related that when she tried to discipline A.N. for misconduct, A.N. threatened to call the authorities and report that Bunch was abusing her children. Bunch stated that A.N. was a liar as did appellant's brother, Leonard Perez.

Evidence was offered that appellant voluntarily relinquished his parental rights to A.N. in August 2000.

**Rule 803(4)**

In his first point of error, appellant contends that the trial court erred in admitting the testimony of Robin Beauregard under the medical diagnosis and treatment exception to the hearsay rule. *See* Tex. R. Evid. 803(4). We agree that the trial court erred in admitting A.N.'s hearsay statements to Beauregard because (1) Beauregard was not shown to be a medical professional, *see Moore v. State*, 82 S.W.2d 399 (Tex. App.—Austin 2002, pet. ref'd), and (2) the statements were made during an extended period of counseling and did not possess the guarantees of trustworthiness

7

on which the medical diagnosis and treatment exception to the hearsay rule is founded. *See Jones v. State*, 92 S.W.2d 619, 623-24 (Tex. App.—Austin 2002, no pet.).

There was a voir dire examination of Beauregard in the jury's absence prior to her trial testimony. Appellant objected that Beauregard's testimony would be hearsay and that she was only the "current" therapist and that A.N. had been diagnosed and treated by others earlier. The State expressly announced that the evidence was admissible under Rule 803(4) and accepted its burden.[4] After the voir dire examination, over the repeated objections of the appellant, the trial court expressly admitted Beauregard's testimony on the basis of Rule 803(4).

"Hearsay is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Tex. R. Evid. 801(d). "Hearsay is not admissible except as provided by statute or these rules or by other rules prescribed pursuant to statutory authority." Tex. R. Evid. 802.

In *Jones v. State*, this Court stated:

> The rule against hearsay is a rule of exclusion. Courts have long recognized exceptions to that exclusion tailored to allow the introduction of evidence that is likely to be trustworthy. Common to the various hearsay exceptions is the notion that circumstances attendant to the out-of-court statement provide sufficient guarantees of the statement's trustworthiness, thus rendering unnecessary the normal judicial assurances of trustworthiness secured by cross-examination and the oath. 5 *Wigmore on Evidence* §§ 1420, 1422 (3d ed. 1940).

---

[4] When the State seeks to introduce testimony, it bears the burden of establishing the admissibility of such evidence. *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). The proponent of hearsay testimony must point to a hearsay exception before such testimony will be admitted. *Moore v. State*, 82 S.W.2d 399, 410 (Tex. App.—Austin 2002, pet. ref'd) (Patterson, J., concurring). Thus, the proponent of hearsay testimony has the burden of laying the proper predicate and establishing its admissibility. *Id.*

8

92 S.W.3d 619, 622 (Tex. App.—Austin 2002, no pet.).

This is true of the medical diagnosis and treatment exception involved in the instant case which provides:

> Statements made for the purposes of medical diagnosis or treatment and describing medical history, or part or present symptoms, pain, or sensations, or the reception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

Tex. R. Evid. 803(4). Rule 803(4) is based on the assumption that the patient appreciates that the effectiveness of the treatment may depend on the accuracy of the information provided to the physician. *Fleming v. State*, 819 S.W.2d 237, 247 (Tex. App.—Austin 1991, pet. ref'd).

Some courts have allowed "therapists" to testify about statements made to them in the course of individual or group therapy sessions. Nevertheless, the offered witness's qualifications must be shown to conform to the rule in order to ensure that the medical diagnosis and treatment exception's assumption that patients seeking medical care will be honest and truthful in order to obtain proper treatment remains intact. *See Fleming*, 819 S.W.2d at 247. "If a witness's testimony fails to meet Rule 803(4)'s criteria requiring that the statement be made to medical personnel in the course of diagnosis and treatment, then the testimony cannot overcome the hearsay rule." *Moore*, 82 S.W.3d at 404.

Appellant contends that the State did not meet its burden under Rule 803(4) because implicit in the rule is that the testifying witness be part of the medical profession or otherwise qualified. Appellant contends that the State failed to lay the proper predicate regarding Beauregard's qualifications.

9

Beauregard testified that she was the Director of Education at the Cedar Ridge Charter School, had a master's degree in education and had been a licensed professional counselor for three years. Beauregard was under contract with the home where the eleven-year-old A.N. lived and she agreed to work with A.N. beginning February 7, 2001. This was approximately one year after A.N. entered foster care for the second time, and nine months after her outcry against her father. The record reflects the prosecutor's interrogation on voir dire examination.

> Q. And on that date [February 7, 2001] did you diagnose her with adjustment disorder and set treatment goals to be relationships with others, dealing with loss of mom, and dealing with sexual abuse?
>
> A. I did not set the diagnosis. That was done by a psychologist. The treatment goals, yes, we [Beauregard and A.N.] decided those in therapy.

At trial, during the State's interrogation, the record shows:

> Q. In your therapy sessions you don't define for her the only things that she can talk about. She can bring up anything that she wants with you?
>
> A. Yes, of course.

Beauregard testified about seven separate sessions from February 7 to June 7, 2001, and indicated that she was still A.N.'s therapist at the time of the trial. Beauregard related that they discussed relationship issues, A.N.'s identity and self-esteem, the loss of A.N.'s mother,[5] A.N.'s sexualized behavior in the classroom, and bad dreams A.N. had. They did not discuss any sexual

---

[5] The record reflects that A.N.'s mother left her when she was two weeks old, more than ten years before the therapy sessions.

abuse issues because of A.N.'s wishes. Beauregard was unaware of A.N.'s outcry against the brothers, David and Santos, or the other five boys concerning sexual abuse. Beauregard never stated that she discussed with A.N. the importance of telling the truth in the sessions.

Turning to qualifications, Beauregard testified that she was a licensed professional counselor, presumably by the State of Texas although that was not established. *See* Tex. Occ. Code Ann. § 503.003 (West 2003). Being a state-licensed professional counselor does not authorize the individual to practice medicine as defined by the laws of this state. *Id*. § 503.004. A "physician" means a person licensed to practice medicine in this state. *Id*. § 151.002(12). "Practicing medicine" means the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures by those conditions, by a person who (a) publicly professes to be a physician or surgeon; or (b) directly or indirectly charges money or other compensation for those services. The State made no effort to show Beauregard's training as a counselor and she was not working under the supervision of a physician or even a psychologist.

In *Moore*, this Court held that Rule 803(4) clearly requires the statements by the declarant be made for purposes of medical diagnosis or treatment, and the trial court erred in admitting the witness's testimony over objection even though she was a licensed psychotherapist, licensed clinical social worker and an advanced clinical practitioner. The "therapist" did not possess any medical degrees and could not prescribe medicine. The State failed to elicit evidence to explain how a psychotherapist differs from a psychiatrist or psychologist. Further, the record did not show

11

how the therapist used a Diagnostic and Statistical Manual to make a medical diagnosis or her training in this regard. *Moore*, 82 S.W.3d at 404-05.

In the instant case, Beauregard was far less qualified than the witness in *Moore*. Beauregard had no medical degree and was not a physician. Even as a licensed counselor, she was not authorized to practice medicine. She was not working under the supervision of a physician or a psychologist. There is only an inference that a diagnosis was made by an unnamed psychologist, not shown to be licensed. The treatment goals were decided upon in part by the patient herself. Under all the circumstances, Beauregard was not qualified to testify. Rule 803(4) clearly requires the statements by the declarant be made for purposes of medical diagnosis or treatment. The trial court abused its discretion and erred in admitting Beauregard's testimony over objection. The State did not meet its burden. *See id.* at 405.

Still further, we note that appellant complains of the scope of the testimony permitted by the trial court's ruling. In *Jones*, the defendant contended that Rule 803(4) was limited to statements made by a person seeking medical diagnosis and treatment and that the rule does not extend during the actual course of treatment. 92 S.W.3d at 620.

In *Jones*, this Court stated:

> "Rule 803(4) is premised on the patient's selfish motive in receiving appropriate treatment." *Moore v. State*, 82 S.W.3d 399, 413 (Tex. App.—Austin 2002, pet. ref'd) (Patterson, J., concurring). This motive is no longer present once a diagnosis has been made and treatment has begun. The details a patient may report during an extended course of treatment may be prompted by other motives, such as denial or deception, or be influenced by the treatment process itself. *See id.* (safeguards inherent in rule not present when statements were made during counseling sessions years after events discussed, after allegations had been made repeatedly, and after child declarants had heard their mother's rendition of facts).

12

*Id*. at 623.

In *Jones*, the statements were made by the complainant over a ten-month period to a therapist. It was held that these statements made during the course of such counseling did not possess the guarantees of trustworthiness on which the medical diagnosis or treatment exception is founded. The same is true of the "statements" made to Beauregard over a period from February 7 to June 7, 2001, particularly where A.N. had been previously subjected to therapy by another, interviewed by a doctor, and in a foster care setting for some time. Moreover, the statements made must concern facts that are "reasonably pertinent to diagnosis or treatment." Tex. R. Evid. 803(4); *Gregory*, 56 S.W.3d at 183. And the content of the statement must be such as is reasonably relied upon by a physician in treatment or diagnosis. *United States v. Renville*, 779 F.2d 430, 436 (8th Cir. 1985). This was missing in the instant case. Further, there was no evidence that A.N. was aware of seeing Beauregard for the purpose of medical treatment and that her statements were for the purpose of treatment. *See Powell v. State*, 88 S.W.3d 794, 800 (Tex. App.—El Paso 2002, pet. dism'd). For all of these reasons, Rule 803(4) was misused here and the trial court abused its discretion in admitting Beauregard's testimony under Rule 803(4).

**Harm Analysis**

A violation of evidentiary rules that results in the erroneous admission of evidence is non-constitutional error under Rule 44.2(a). Tex. R. App. P. 44.2(b); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997); *Tate v. State*, 988 S.W.2d 887, 890 (Tex. App.—Austin 1999, pet. ref'd). Any

13

nonconstitutional error "that does effect substantial rights must be disregarded." Tex. R. App. P. 44.2(b); *Johnson v. State*, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King*, 953 S.W.3d at 271 (citing *Kotteakos v. United States*, 328 U.S. 756, 776 (1946)). A criminal conviction should not be overturned for nonconstitutional error if the appellate court upon examining the record as a whole, has fair assurance that the error did not influence the jury, or had but slight effect. *Cobb v. State*, 85 S.W.2d 258, 272 (Tex. Crim. App. 2002); *Johnson*, 967 S.W.2d at 417. Moreover, the improper admission of evidence does not constitute reversible error if the same facts are proved by other properly admitted evidence. *See Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999) (holding that any error in the admission of hearsay testimony was harmless in light of other properly admitted evidence proving same fact).

Much of Beauregard's testimony concerned her observations about A.N. rather than A.N.'s hearsay statements. Beauregard stated A.N. acted "silly" after talking to a prosecutor, showed "anxiety" about upcoming trial dates, was "sad" after talking to an adoption worker, appeared "concerned" about her father going to prison, seemed to be "focusing on moving forward," and was "becoming more mature." They did not discuss the sexual abuse as that was A.N.'s wish. There were no hearsay statements about the offenses charged. Large segments of Beauregard's testimony did not appear relevant. An examination of the record as a whole reveals that the subject matter of the hearsay statements was properly proved elsewhere, principally during A.N.'s trial testimony and that of her earlier therapist, Arcotta. We find the error in the admission of Beauregard's testimony to be harmless under these circumstances. The first point of error is overruled.

14

## Expert Testimony

Appellant contends in his second point of error that the trial court erred in admitting the testimony of Dr. William Lee Carter after the State failed to lay the proper predicate for its admission into evidence under Rule 702. Tex. R. Evid. 702.

Before the jury, Dr. Carter testified, based on his education, training, experience, and studies as to the behavioral characteristics of sexually abused children. In answer to hypotheticals based on trial evidence, he testified that many of the behavior characteristics displayed in the hypotheticals were common among sexually abused children. Dr. Carter did not know A.N. nor had he examined her. He did not testify that A.N. was truthful. Dr. Carter also testified that sexually abused children can make false accusations, that a child can be "analyzed" so frequently the child may come to believe what she has been told to say, and that children-witnesses are often anxious about court appearances whether they have been sexually abused or not.

Appellant contends that Dr. Carter should not have been allowed to testify because the State did not sustain its burden to show by clear and convincing evidence that Dr. Carter's testimony was relevant and reliable to assist the jury, and the trial court abused its discretion in permitting the testimony.

Rule 702 which governs the admissibility of expert testimony provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Tex. R. Evid. 702.

The proponent of an expert's testimony bears the burden of proof. *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996); *Roise v. State*, 7 S.W.3d 225, 233 (Tex. App.—Austin 1999, pet. ref'd). As the rule itself requires, the proponent of the testimony must establish (1) that the scientific, technical, or other special knowledge will aid the trier of fact, and (2) that the expert witness is qualified to testify on the subject. *See Penry v. State*, 903 S.W.2d 715, 762 (Tex. Crim. App. 1995); *Roise*, 7 S.W.3d at 234. And it has been stated "that a third hurdle for the proponent is required—that the subject matter of the testimony is an appropriate one for expert testimony." 2A Steven Goode et al., *Texas Practice: Courtroom Handbook on Texas Evidence*, Article VII, Rule 702 at 729 (West 2003).

First, an expert's opinion should be based on a body of scientific technical or other specialized knowledge that is relevant (pertinent to the facts of the case), and sufficiently reliable for the expert's testimony to assist the jury or trier of fact. *Roise*, 7 S.W.3d at 234; *see also E. I. duPont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995). Second, no precise rule or rigid formula exists for determining whether a particular witness is qualified to testify as an expert. *Roise*, 7 S.W.3d at 234. "It is almost impossible to lay down any definite guidelines for determining the knowledge, skill or experience required in a particular case or of a particular witness." *Rogers v. Gonzales*, 654 S.W.2d 509, 513 (Tex. App.—Corpus Christi 1983, writ ref'd n.r.e.). The expertise must be measured against the particular opinion the expert is offering. *Roise*, 7 S.W.3d at 234. Licensure or certification in a particular discipline is not a per se requirement. *Harnett v. State*, 38 S.W.3d 650, 659 (Tex. App.—Austin 2000, pet. ref'd).

While the proponent of the testimony has the burden of establishing the expert's qualifications, the trial court has the responsibility to ensure that "those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion." *Broders*, 924 S.W.2d at 152. The inquiry must be into the actual qualification. *Id*. There must be a "fit" between the subject matter at issue and the expert's familiarity therewith. *Broders*, 924 S.W.2d at 152. The proponent must establish that the expert had the knowledge, skill, experience, training, or education regarding the specific issue before the trial court which would qualify the expert to give an opinion on that particular subject. *Id*.

Expert testimony that a child exhibits behavioral characteristics that have been empirically shown to be common among children who have been abused *is relevant* and admissible as substantive evidence under Rule 702. *Hitt v. State*, 53 S.W.3d 697, 707 (Tex. App.—Austin 2001, pet. ref'd); *Vasquez v. State*, 975 S.W.2d 415, 417 (Tex. App.—Austin 1998, pet. ref'd) (citing *Yount v. State*, 872 S.W.2d 706, 709 (Tex. Crim. App. 1993)). Thus, the evidence that Dr. Carter was called upon to give has been held relevant in child sexual abuse cases. *See Cohn v. State*, 849 S.W.2d 817, 819-21 (Tex. Crim. App. 1993).

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), upon which appellant relies in part, held that the Federal Rule 702 required that scientific evidence be "not only relevant but reliable." *Id*. at 589-901. Dealing with "hard scientific" evidence, *Daubert* rejected *Frye v. United States*, 293 F. 1013 (App. D. C. 1923). In determining reliability, *Daubert* held that a number of factors bear on the inquiry: (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) the

17

known or potential rate of error; and (4) general acceptance within the relevant scientific community. *Id*. at 593-95. *Daubert* emphasized that the inquiry was a flexible one.

Earlier, the Texas Court of Criminal Appeals in *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992), had rejected *Frye* and interpreted Texas Rule 702 as requiring the satisfaction of a three-part reliability test before *novel* scientific evidence could be admissible: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have properly applied on the occasion in question. *Id*. at 573. A number of factors relating to the determination of reliability were also listed. *Id*. In 1995, the Texas Supreme Court adopted the *Daubert* test and added additional non-exclusive factors. *Robinson*, 923 S.W.2d at 556-57. Later, the Texas Court of Criminal Appeals held that its *Kelly* inquiry was substantially identical to the *Daubert* inquiry, *Jordan v. State*, 928 S.W.2d 550, 554 (Tex. Crim. App. 1996), and that although *Kelly* involved *novel* scientific evidence, the *Kelly* analysis applied to all scientific evidence, novel or not. *Hartman v. State*, 946 S.W.2d 60, 62-63 (Tex. Crim. App. 1997).

These "hard" or "novel" scientific cases gave birth to numerous factors to be considered which were not always consistent and all too frequently were tied to the particular facts of the case spawning the factors. Despite claims of flexibility, trial courts, as gate keepers, were confronted with applying these factors to non-scientific expert testimony. In *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds*, *State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999), the court noted that the *Daubert* inquiry was "flexible" but the *Daubert* factors "do not necessarily apply outside the hard science context." *Nenno*, 970 S.W.2d at 561. The

18

court emphasized "methods of proving reliability will vary, depending upon the field of expertise."

*Id.* The court then stated:

> When addressing fields of study aside from the hard sciences, such as the social sciences or fields that are based primarily upon experience and training as opposed to the scientific methods, *Kelly*'s requirement of reliability applies but with less rigor than to the hard sciences. To speak of the validity of a "theory" or "technique" in these fields may be roughly accurate but somewhat misleading. The appropriate questions are: (1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field. These questions are merely an appropriately tailored translation of the *Kelly* test to areas outside of hard science. And, hard science methods of validation, such as assessing the potential rate of error or subjecting a theory to peer review, may often be inappropriate for testing the reliability of fields of expertise outside the hard sciences.

*Id.* at 561; *see also Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

In *Nenno*, the court reviewed several federal cases in reaching the decision. *See, e.g.*, *United States v. Jones*, 107 F.3d 1147, 1156, 1158 (6th Cir. 1997) (*Daubert*'s factors apply to hard science but not to expert testimony involving clinical medicine); *Freeman v. Case Corp*, 118 F.3d 1011, 1016 n.6 (4th Cir. 1997) (*Daubert* "analysis" inappropriate where expert relies on his experience and training and not a particular methodology to reach his conclusion); *United States v. Bighead*, 128 F.3d 1329, 1330 (9th Cir. 1997) (*Daubert*'s tests for admissibility "do not require exclusion of expert testimony that involves specialized knowledge rather than scientific theory").

Dr. Carter was shown to be a psychologist in solo practice at the Cedar Crest Hospital and Residential Treatment Center in Belton. He had obtained a bachelor, masters, and doctoral degrees in psychology all from Baylor University. He had been licensed by the State as a

19

psychologist since 1983 and had focused on child sexual abuse cases for about ten years. Dr. Carter had handled hundreds to a thousand of such cases and had testified in court as an expert witness more than fifty times. The doctor related that he was a member of various local, state and national psychological associations and obtained a speciality certification in the area of psychological evaluation and assessment . Dr. Carter had published psychology books about family relationships and the treatment of child sex abuse victims, a teenage workbook. He testified that the sub-field of child sexual abuse dynamic is a subject well established in the field of psychology. Dr. Carter maintained his annual continuing education in the sub-field by attending psychology seminars and reading and studying.

Appellant claims that the State did not meet its burden of proving either the validity of the scientific theories or principles underlying Dr. Carter's testimony or the validity of the method used for applying the theories or principles. Appellant relies upon *Kelly* and *Fowler v. State*, 958 S.W.2d 853 (Tex. App.—Waco 1997), *aff'd*, 991 S.W.2d 258 (Tex. Crim. App. 1999), rather than *Nenno* and its progenies. We are here dealing with a soft science or specialized knowledge. Turning to *Nenno*'s three factors, 970 S.W.2d at 561, we observe that Dr. Carter's field of expertise is a legitimate one. *See Hernandez v. State*, 53 S.W.3d 742, 751 (Tex. App.—Houston [1st Dist.] 2001, no pet.). Dr. Carter's opinions in answer to hypothetical questions were based on his extensive experience over a ten-year period observing sexually abused children in hundreds of cases. The special knowledge that qualifies a witness to give an expert opinion may be derived from specialized education, practical experience, a study of technical works, or a varying combination of these things. *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000). While it cannot do so in every case,

20

experience alone may provide a sufficient basis for an expert's testimony in some cases. *Gammell v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998); *Gregory v. State*, 56 S.W.3d 164, 180 (Tex. App.—Houston [14th Dist.] 2001, pet. dism'd, improvidently granted); *Olin Corp. v. Smith*, 990 S.W.2d 789, 795-98 (Tex. App.—Austin 1999, pet. denied). Due to Dr. Carter's superior knowledge and experience concerning the behavior of children who have suffered sexual abuse, the common characteristics and dynamics of such children were within the scope of his expertise. Dr. Carter's unimpeached testimony, direct and circumstantial, supported the fact that his opinion and writings on sexual abuse of children was accepted by his relevant scientific community of psychologists. Appellant fails to point what "principles involved in the field" that Dr. Carter's testimony failed to rely on or utilize. Even the factors set forth in *Nenno* may be inappropriate in testing the reliability of every field of expertise outside the hard sciences.

Reviewing courts will not disturb the trial court's determination that a witness is or is not qualified as an expert witness unless a clear abuse of discretion is shown. *Morales v. State*, 32 S.W.2d 862, 865 (Tex. Crim. App. 2000). The appellate court will not conclude that there is an abuse of discretion merely because under the same circumstances it would have ruled differently or if the trial court committed a mere error in judgment. *Robinson*, 923 S.W.2d at 558. We are required to gauge an abuse of discretion by determining whether the trial court acted without reference to any guiding rules or principles. *Id.*

We hold that the trial court did not abuse its discretion in allowing Dr. Carter to testify as an expert as to the behavioral characteristics of sexually abused children. The State met

21

its burden under Rule 702 and the trial court did not err in overruling the Rule 403[6] objection in connection therewith. *Cf. Wyatt*, 23 S.W.3d at 28; *Henderson v. State*, 77 S.W.3d 321, 325 (Tex. App.—Fort Worth 2002, no pet.). The second point of error is overruled.

## Motion for New Trial

In his third point of error, appellant urges that the trial court erred in overruling his motion for a new trial. Appellant briefs and argues this point together with his challenge to the factual sufficiency of the evidence to support either conviction in points of error four and five.

The guilt/innocence phase of the trial was conducted from February 4 to 8, 2002. Sentences were imposed on March 28, 2002. The only motion for new trial in the record was filed on April 5, 2002. No action was taken on such unsworn motion after that date. The motion appears to have been overruled by operation of law seventy-five days after punishment was imposed. *See* Tex. R. App. P. 21.8(c). No error appears to be presented.

Appellant's appellate counsel notes that the motion reflects a certificate of service on February 15, 2002, and that the motion, although belatedly filed by trial counsel, was heard and overruled on March 28, 2002. A somewhat unusual procedure is reflected by the record. On March 28, 2002, the trial court conducted the punishment phase of the trial, heard a motion for new trial, and conducted a revocation of probation in a different case all in one setting. Only after a discussion was it determined that the court would proceed with the punishment phase first. At the hearing, the trial court took "judicial notice" that the new trial motion had been shown to the court on February

---

[6] Tex. R. Evid. 403. Rule 403 does not require that the balancing test be performed on the record. *Hett v. State*, 53 S.W.3d 697, 706 (Tex. App.—Austin 2001, pet. ref'd).

22

15, 2002. We have no way to compare the unsworn motion filed on April 5 with the motion referred to at the hearing on March 28, although appellant urges that it was the same motion.

"The defendant may file a motion for new trial before but not later than 30 days after the date when the trial court imposes or suspends the sentence in open court." Tex. R. App. P. 21.4(a). The time begins running when the sentence is imposed or suspended even if the judgment of conviction is not signed until later. *Rodarte v. State*, 860 S.W.2d 108, 110 n.2 (Tex. Crim. App. 1993). Ordinarily, a motion for a new trial is not made until the defendant has been sentenced or granted probation. 43A George E. Dix & Robert O. Dawson, *Texas Practice: Criminal Practice and Procedure* § 41.31 (2d ed. West 2001). Appellant has not discussed the propriety of a premature hearing on an unfiled and unsworn motion for new trial. *Cf. Cortez v. State*, 735 S.W.2d 294, 301 (Tex. App.—Dallas 1987, no pet.) (holding a motion for new trial *filed* after the jury's verdict and before sentence is timely).

"A motion for new trial is a prerequisite to presenting a point of error on appeal when necessary to adduce facts not in the record." Tex. R. App. P. 21.2.[7] In criminal cases sufficiency issues need not be preserved to be reviewed on appeal. *Givens v. State*, 26 S.W.3d 739, 740-41 (Tex. App.—Austin 2000, pet. ref'd) (citing *Flanary v. State*, 316 S.W.2d 897, 898 (Tex. Crim. App. 1958) (op. on reh'g)). *In re A.P.*, 42 S.W.3d 248, 255-56 (Tex. App.—Waco 2001, no pet.); *Chestnut v. State*, 959 S.W.2d 308, 311 (Tex. App.—El Paso 1997, no pet.) (claim of factual sufficiency need not be preserved).

---

[7] If a motion for a new trial is necessary to adduce facts not in the record, it must be supported by an affidavit though not required by statute or rule. *Reyes v. State*, 849 S.W.2d 872, 816 (Tex. Crim. App. 1993); *Flores v. State*, 18 S.W.3d 796, 798 (Tex. App.—Austin 2000, no pet.).

23

Appellant need not have made a motion for a new trial if his real purpose was to preserve error for appeal. The motion contained several grounds, but appellant calls attention only to the allegation that the verdict is contrary to the law and evidence. *See* Tex. R. App. P. 21.3(h). Appellant notes that since *Clewis v. State*, 922 S.W.2d 126, 132 (Tex. Crim. App. 1996), "this question has been equated to a factual sufficiency issue," citing *Youens v. State*, 988 S.W.2d 404, 407 n.2 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (remedy for factual sufficiency is new trial which makes it equivalent to the granting of new trial on the basis that verdict was contrary to law and evidence).

At the March 28th hearing, there was only argument. Appellant did not single out factual sufficiency under the proper standard. On appeal, appellant relies upon the trial court's remarks when ruling on the motion for new trial[8] and at the conclusion of the punishment phase. The trial court did not believe A.N., the complainant, and did not agree with the verdict. The trial court properly ruled, however, that the jury was the trier of facts.

Under all the circumstances, the trial court did not abuse its discretion in overruling the motion for new trial, if the motion was properly before the court. The third point of error is overruled.

### Factual Sufficiency

In the fourth and fifth points of error, appellant asserts that evidence is factually insufficient to support appellant's two convictions. An analysis of the factual sufficiency of the

---

[8] "In ruling on a motion for new trial, the court must not summarize, discuss, or comment on the evidence." Tex. R. App. P. 21.8(h).

evidence begins with the presumption that the evidence supporting the judgment of conviction is *legally* sufficient. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996). In a factual sufficiency challenge, the evidence must be viewed without employing the prism "in the light most favorable to the verdict." *Id*. The evidence must be viewed in a neutral light and reversal will occur only if the evidence supporting guilt is so obviously weak as to render the conviction clearly wrong and manifestly unjust, or if the evidence, although adequate when taken alone, is so greatly outweighed by the overwhelming weight of contrary evidence as to render the conviction clearly wrong and manifestly unjust. *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002); *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).[9] While the reviewing court has some authority in a factual sufficiency situation to disregard evidence that supports the verdict, it must be appropriately deferential so as to avoid substituting its own judgment for that of the fact-finder. *Vasquez*, 67 S.W.3d at 236; *Westbrook v. State*, 29 S.W.2d 103, 112 (Tex. Crim. App. 2000); *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). An appellant court should not substantially intrude upon the jury's role as the sole judge of the weight and credibility of witness testimony. *Westbrook*, 29 S.W.2d at 112.

---

[9] In *Johnson v. State*, 23 S.W.3d 1 (Tex. Crim. App. 2000), the court found that it was unclear whether *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996) had adopted both civil factual sufficiency review standards for criminal cases. The *Johnson* court then proceeded to do so. Evidence can be factually insufficient if (1) it is so weak as to be clearly wrong and manifestly unjust, or (2) the adverse finding is against the great weight and preponderance of the available evidence. *Id*. at 11. *See also Hitt v. State*, 53 S.W.3d 697, 709 (Tex. App. 2001, pet. ref'd); 43 George E. Dix & Robert O. Dawson, *Texas Practice: Criminal Practice and Procedure* § 31.136 (West 2001).

In the instant case, appellant recognizes the standard of review, sets out the facts and notes the inconsistencies in the complainant's testimony, and then chooses the first component of the test—"that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination." Appellant does not single out the elements of the offense whose proof is obviously weak nor does he impartially compare evidence that tends to prove the existence of a disputed fact or facts with evidence that tends to disprove that fact or those facts. *See Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim. App. 1998). Appellant does not analyze why in his opinion the facts fall short of the standard of review. Appellant has inadequately briefed the factual sufficiency issues. *See McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997); *Moon v. State*, 44 S.W.3d 589, 593 (Tex. App.—Fort Worth 2001, pet. ref'd); *see also Gallegos v. State*, 76 S.W.3d 224, 228 (Tex. App.—Dallas 2002, pet. ref'd); *Turner v. State*, 4 S.W.3d 74, 81 (Tex. App.—Waco 1999, no pet.).

Appellant asserts that the record reveals "that serious questions were raised as to the credibility of [complainant]." Further, appellant notes that the jury did not have an "easy time" in making its decision; that the jury had a portion of the complainant's testimony read back; that twice the jury indicated that it was "hung," giving the numerical split; and that the trial court gave an "Allen" charge before a verdict was reached. Still further, appellant calls attention to the trial court's statements at the penalty stage of the trial and the hearing on the new trial motion that it did not believe the complainant and would not have found appellant guilty if the court had been the trier of the facts. These factors are interesting, but they are not evidence to be considered under the appropriate standard of review.

The twelve-year-old A.N., who had been in foster care for two years, testified under oath that appellant had sexually molested her. She related that on one occasion while she was at her Aunt Eunice's house, appellant brushed aside her art work, threw her on the bed, and sexually assaulted her until her "privates" became numb and she screamed. This testimony alone, if believed, would have supported the aggravated sexual assault allegations. This also was the testimony that the jurors requested be read back to them. A.N. also testified that appellant had her masturbate him. This alone, if believed, would have supported the indecency with a child charge.

There was testimony that A.N. had insisted for five months in foster care that appellant had not sexually molested her. This was consistent with her normal medical examination, although Dr. Nauert testified that there could be a normal examination even if there had been multiple penetrations given the passage of time. Dr. Nauert explained it is rare for a doctor to say with certainty that a child had been abused in the absence of pregnancy or the presence of a sexually transmitted disease. A.N. did report that she had sex with brothers, David and Santos, and unwanted sex with five other boys. These reports were not investigated.

Also on this side of the ledger, A.N. complained to Beth Arcotta, a therapist, that her foster mother, Dorothy Place, was pressuring her to state that appellant had molested her. Arcotta talked to Place about the pressure. However, when A.N. expressed the sense that she was unloved by her foster mother, Arcotta worked with her on the ways to win favor with Place. Shortly thereafter, A.N. made her outcry to Place.

Back on the opposite page, A.N. testified that she loved her father and had been loyal to him, but when another girl at the foster home told her it was not natural for parents to have sex

27

with their children, she knew appellant had lied to her. She became angry. A.N. admitted that she previously had told lies to Arcotta and others.

The State offered evidence that A.N.'s shorts had holes in the crotch when she arrived at Place's home. A.N. said appellant placed the holes in her shorts so he could have sexual intercourse with her without removing her clothing. It was shown that new shorts purchased after A.N. was in Place's home developed similar holes when A.N. masturbated and rubbed against objects.

A.N. arrived at Place's home with a $100 bill in a sandwich baggie. The prosecution relied upon such evidence to support A.N.'s claim that appellant had used her as a prostitute for $50 and $100 fees. However, A.N. testified that when the police arrived to arrest appellant for revocation of probation, he had told her to secure his wallet. Moreover, A.N. was at a children's shelter several weeks before being moved to Place's home.

The testimony of a child victim alone is sufficient to support a conviction for aggravated sexual assault or indecency with a child. *See* Tex. Code Crim. Proc. Ann. art. 38.07 (West Supp. 2003); Tex. Pen. Code Ann. §§ 21.11, 22.021(a)(1)(B) (West 2003). *Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref'd); 43 George E. Dix & Robert O. Dawson, *Texas Practice: Criminal Practice and Procedure* § 31.355 (2d ed. West 2001). Moreover, the jury is the sole judge of the credibility of the witnesses and the weight to be given the evidence, and may choose to believe all, some, or none of it. Tex. Code Crim. Proc. Ann. art. 38.04 (West 1974); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000); *Rachal v. State*, 917 S.W.2d 799, 805 (Tex. Crim. App. 1996); *Skillern v. State*, 890 S.W.2d 849, 879 (Tex. App.—Austin 1991, pet.

28

ref'd). Thus, the jury is permitted to believe or disbelieve any part of the testimony of any witness. *Jones v. State*, 984 S.W.2d 254, 258 (Tex. Crim. App. 1998). Reconciliation of evidentiary conflicts is solely a function of the trier of fact. *Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986); *Bowden v. State*, 628 S.W.2d 782, 784 (Tex. Crim. App. 1982); *Perez v. State*, 960 S.W.2d 84, 86 (Tex. App.—Austin 1997, no pet.) (citing *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991)). The jury could have accepted that portion of A.N.'s testimony sufficient to support the convictions and disregarded the inconsistencies. "A decision is not manifestly unjust because the jury resolved the manifestly conflicting views of the evidence in favor of the State." *Cain*, 958 S.W.2d at 409.

We have reviewed all the evidence impartially in a neutral light. With due deference to the jury verdicts, we conclude that the evidence is factually sufficient to support both convictions. The fourth and fifth points of error is overruled.

The judgment is affirmed.

_____

John F. Onion, Jr., Justice

Before Chief Justice Law, Justices B. A. Smith and Onion[*]

Affirmed

Filed: August 14, 2003

Publish

---

[*] Before John F. Onion, Jr., Presiding Judge (retired), Court of Criminal Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).