Opinion issued December 16,
2010.   

 

 



                                                                        

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-09-00671-CR

NO. 01-09-00672-CR

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



ISAIAH ELAM THOMAS, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 

 



On Appeal from the 248th District Court

Harris County, Texas

Trial Court Cause No. 1141973

Trial Court Cause No. 1141974

 

 



MEMORANDUM OPINION

          A
jury convicted Isaiah Elam Thomas of aggravated robbery and, after Thomas
pleaded true to the allegations in an enhancement paragraph, assessed
punishment at twenty years’ confinement. 
See Tex. Penal Code Ann. § 29.03(a) (Vernon 2003).  On appeal, Thomas contends that factually
insufficient evidence exists to support the jury’s verdict because the
complainants knew Thomas personally and gave a detailed description of the
robbers to the police at the scene, but failed to identify Thomas by name until
hours after the incident while at the police station, after they had a chance
to confer with one another.  We hold that
the State presented factually sufficient evidence that Thomas committed the
robbery and therefore affirm.

Background

Thomas lived next door to the
complainants, Lakeisha Roberts and Antoinette Breed, for a few months before
the robbery.  During this time, Roberts
and Thomas had become friends.  Roberts
occasionally invited Thomas to her apartment and over for dinner, and they
would sometimes have “water fights” to pass the time.  Roberts had also been to Thomas’s apartment,
where she met Jeremiah Curry, Thomas’s brother, and Derrick Tillis, his
cousin.  A few days before the robbery,
Thomas mentioned to Roberts that he had lost some money, and Roberts and Breed
let Thomas come into their apartment and look around for the money.  Shortly thereafter, Roberts and Breed
purchased a new car with money Roberts had received from an insurance
settlement. 

On the night of the robbery, Breed,
Roberts, her son Kailen, Kailen’s cousin Lakeisha Brown, and Roberts’
goddaughter Denaisha were in the apartment. 
Around midnight, Brown was talking on her cell phone in the living
room.  Roberts, Breed, and Kailen were
viewing a movie in the master bedroom, while Denaisha slept in Kailen’s
room.  Brown heard a knock on the front
door and told Roberts, who went to the door and asked who was knocking.  Someone outside responded, “Mike.”  Roberts had a friend named Mike, so she
opened the door.  An assailant
immediately “popped” Roberts in the face, twice, with the butt of a gun.  The person, hitting her, yelled at her to get
down on the ground.  Two other men and
two women also entered Roberts’s apartment.

The man who hit Roberts wore a
bandana that covered most of his face, but Roberts recognized Thomas’s “baby
fro” hairstyle, his distinctive “kid’s” voice, and his physical build. Thomas
was sixteen at the time of the robbery. 
According to Roberts, the only other person she knew at the apartment
complex who had a voice like Thomas was her ten-year-old son, Kailen.  She felt confident that Thomas was the one
attacking her.  Roberts also recognized
Curry and Tillis’s voices, and she heard the men refer to each other by their
first names.  

As Roberts opened the door, Breed and
Kailen stood in the doorway to the master bedroom.  Thomas bound Roberts’s hands and covered her
eyes with duct tape, while Curry ordered Breed to lie down on the living room
floor and Kailen to sit on the couch. 
Curry then taped Breed’s hands together and put duct tape over her eyes,
but the tape did not stick.  Breed
watched the remainder of the robbery. 
Breed saw Thomas, Curry, and Tillis ransack the apartment and decide
which items to steal. Breed recognized Thomas from his hairstyle, shoes, and
his voice when he said Curry’s name.  

Brown did not know any of the
robbers; however, she heard Thomas and Curry call each other by name during the
robbery.  Thomas asked Curry if he should
take Roberts’s computer, and Curry replied, “No, Isaiah[, it] is going to take
too much space.”  According to Brown, as
the men searched the apartment, they asked about Thomas’s missing money, as
well as kicked and hit the occupants with their guns.  As Thomas left the apartment, he kicked
Roberts and said, “Bitch, this is for taking my money so I’m repaying you
back.”  After the robbers left, Breed
broke out of her bindings. She and Roberts locked the door and then called the
police.  

Upon arriving at the apartment,
Baytown Police Department Officer Dillow noticed that Roberts was bleeding from
a head wound and that the apartment was in total disarray.  Dillow and BPD Officer Pentecost testified that
the complainants appeared very excited and upset.  Pentecost spoke with Roberts at the scene and
obtained a physical description of the robbers. 
Pentecost did not ask Roberts if she personally knew the robbers.  Although Breed testified that she gave Pentecost
the names of the robbers at the scene, Detective Latta testified that, when he
arrived at the scene, he asked the other officers who may have been involved,
and none of the officers identified the robbers. 

In their statements taken later at
the police station, both Roberts and Breed identified Thomas as one of the
robbers.  Roberts testified that her
formal statement was a more accurate statement than the earlier oral statement
she gave to the officers at the scene, and she attributed the greater detail
and specific identification of Thomas in the latter to the fact that, by this
point, she had had a chance to calm down and get her thoughts together.  When asked on cross-examination why she did
not give the police Thomas’s name at the scene, she stated that she was worried
about her family and, at that time, she was a “startled, nervous wreck” and
“wasn’t thinking straight.”  Breed noted
that, although she and Roberts rode in the same police car to the station, they
did not talk about what happened because they were too shaken up.  Breed also testified that the police put her
and Roberts in separate rooms as soon as they arrived at the station.  Detective Latta noted that when he started
Roberts’s statement approximately four hours after the robbery, she had calmed
down, but she still seemed upset, scared, and worried for her children.

Thomas testified on his own behalf,
denying involvement in the robbery.  He
claimed that he was at a cousin’s house on that night.  Thomas suggested that Roberts and Breed made
up his involvement in the robbery because Roberts had unrequited affection for
him.  He also stated that Roberts and
Breed had briefly exchanged pleasantries with Curry and Tillis, which was not
enough speech to have recognized the men’s voices.  Thomas believed that either Roberts or Breed
had made up the story of his involvement and now felt afraid to change the
story.  On cross-examination, Thomas
conceded that he spoke to Roberts and Breed much more often than his cousin and
brother, and therefore if they recognized any voice from the robbery, it would
likely be his.  

Discussion

Thomas
contends that the State failed to present factually sufficient evidence to
prove that he committed the aggravated robbery of Roberts and Breed.  An appellate court reviews both legal and
factual sufficiency challenges using the same standard of review.  Brooks
v. State, PD-0210-09, 2010 WL 3894613, at *14, 21–22 (Tex. Crim. App. Oct.
6, 2010); Ervin v. State, No. 01-10-00054-CR, 2010 WL 4619329, at *2–4
(Tex. App.—Houston [1st Dist.] Nov. 10, 2010, no pet. h.) (construing majority
holding in Brooks).  Under this
standard, evidence is insufficient to support a conviction if, considering all
the record evidence in the light most favorable to the verdict, no rational
fact finder could have found that each essential element of the charged offense
was proven beyond a reasonable doubt.  See Jackson v. Virginia, 443
U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); In re Winship, 397 U.S. 358,
361, 90 S. Ct. 1068, 1071 (1970); Laster v. State, 275 S.W.3d 512, 517
(Tex. Crim. App. 2009); Williams v. State, 235 S.W.3d 742, 750 (Tex.
Crim. App. 2007).  Viewed in the light most favorable to the verdict, the
evidence is insufficient under this standard in two circumstances:  (1)
the record contains no evidence, or merely a “modicum” of evidence, probative of
an element of the offense; or (2) the evidence conclusively establishes a
reasonable doubt.  See Jackson, 443 U.S. at 314, 318 n.11,
320, 99 S. Ct. at 2786, 2789 n.11, 2789; Laster, 275 S.W.3d at 518; Williams,
235 S.W.3d at 750.  An appellate court
presumes that the fact finder resolved any conflicting inferences in favor of
the verdict and defers to that resolution.  See Jackson, 443
U.S. at 326, 99 S. Ct. at 2793; Clayton v. State, 235 S.W.3d 772, 778
(Tex. Crim. App. 2007).  An appellate court may not re-evaluate the weight
and credibility of the record evidence and thereby substitute its own judgment
for that of the fact finder.  Williams, 235 S.W.3d at 750.

Thomas
contends that the evidence is factually insufficient primarily because Roberts
and Breed, who were friends with Thomas and knew him relatively well, did not
immediately identify Thomas and give his name to the police upon their arrival
at the scene, and this delay wholly undermines Roberts and Breed’s credibility
as complaining witnesses.  Thomas suggests
that their delay in identifying him by name indicates that, after spending time
together on the way to and at the police station, Roberts and Breed fabricated
a story that Thomas committed the robbery.

          But
other testimony supports the jury’s implied determination that Roberts and
Breed were credible when they testified that they recognized Thomas by his
hairstyle, distinctive voice, physical build, and shoes.  Both women and Lakeisha Brown, who did not
know any of the robbers, heard the men refer to each other by their first
names, “Isaiah” [Thomas] and “Jeremiah.” 
All of the women also testified that, during the robbery, they heard the
robbers shouting about missing money.  A
few days before the robbery, Thomas had approached Roberts and Breed to ask about
some money that he had lost, and Breed let him look around in their apartment
for the money.  Roberts testified that,
as Thomas left her apartment during the robbery, he kicked her and said,
“Bitch, this is for taking my money, so I’m repaying you back.”  Although Officer Pentecost and Detective
Latta testified that they did not receive names of the suspects at the scene,
Breed stated that she told Pentecost of the attackers’ names while still at the
apartment.  Pentecost further explained
that he did not specifically ask Roberts whether she knew her attackers.

          On
cross-examination, Roberts explained that she did not initially give Thomas’s
name to the officers because she was startled, nervous, not “thinking
straight,” and worried about her family. 
At the scene, she was still asking herself what happened, asking why
this incident happened to her, and she wondered what she and her family did to
deserve the attack.  All of the officers
agreed that, at the scene, Roberts was very excited, upset, and alarmed, and
she was bleeding from a head wound. 
Latta testified that, although she had calmed down by the time he took
her statement four hours later, she still seemed upset, scared, and worried for
her family.  Breed stated that, although
she and Roberts rode to the police station in the same car, they did not
discuss what happened because they were too shaken up.  She further testified that the officers
placed her and Roberts in separate rooms immediately after arriving at the
station.

          Thomas
cites to the Court of Criminal Appeals’ decision in Johnson v. State for the proposition that Roberts and Breed’s
identification of Thomas is unreliable based upon the record.  See
Johnson v. State, 23 S.W.3d 1, 12 (Tex. Crim. App. 2000).  In Johnson,
the Court of Criminal Appeals affirmed the Corpus Christi Court of Appeals’
reversal of the case based on factually insufficient evidence that Johnson
committed aggravated sexual assault.  Id. at 12.  An assailant unknown to the victim forced his
way into her car, drove the car to a remote location, and raped the
victim.  Id. at 4.  The victim “never
got a lengthy, unobstructed view of [her attacker’s] face,” and could only
provide “scant details” to the police regarding the attacker’s appearance.  Id.  The victim could not positively identify her
attacker from a line-up, though she noted that Johnson’s eyes looked similar to
her attacker’s.  Id.  At trial, the victim
admitted that her identification of Johnson could not be absolutely certain
“because of the conditions and her state of mind.”  Id.
at 5.

          In
contrast to the facts of Johnson,
both Roberts and Breed knew Thomas, Curry, and Tillis.  Although the robbers wore bandanas partially
covering their faces, the women recognized Thomas by his hairstyle, voice, and
physical build.  Although Curry attempted
to cover Breed’s eyes, the tape loosened, and she watched the robbery.  The robbers bound Brown’s hands, but did not
cover her eyes.  Roberts, Breed, and
Brown all heard Thomas and Curry refer to each other by their first names.  Roberts and Breed both positively identified
Thomas as a robber at the police station and during trial, and they never
equivocated on their belief that he was involved.  Roberts specifically stated that she “felt
confident” that Thomas was one of her attackers.  We conclude that the
jury rationally could have found that each element of the charged offense was
proven beyond a reasonable doubt.  Accordingly, we hold
that the evidence was factually sufficient to support Thomas’s conviction for
aggravated robbery.  

          Thomas
further contends that the evidence of identification is factually insufficient
to support the verdict because the jury deliberated for over eight hours on “a
case that ostensibly should have been a slam dunk with two eyewitnesses
identifying a friend and neighbor.”  We
do not consider the length or difficulty of jury deliberations when conducting
a sufficiency of the evidence review.  See Scott v. State, 202 S.W.3d 405, 411
(Tex. App.—Texarkana 2006, pet. ref’d); Perez
v. State, 113 S.W.3d 819, 837 (Tex. App.—Austin 2003, pet. ref’d), overruled on other grounds by Taylor v.
State, 268 S.W.3d 571, 586-89 (Tex. Crim. App. 2008) (noting that
difficulty of deliberations and receipt of Allen
charge are “interesting,” but not evidence to consider in factual sufficiency
analysis).  Lengthy deliberations do not
mean that the jury “arrived at an incorrect verdict or one not supported by
sufficient evidence,” but could instead support a conclusion that the jury
engaged in “thoughtful consideration of the evidence presented and that such
consideration, in turn, lends itself to correctness of the verdict.”  Scott,
202 S.W.3d at 411.  The length of the
jury’s deliberations does not affect our conclusion that factually sufficient
evidence exists to support the jury’s verdict.

Conclusion

We hold that the State presented
factually sufficient evidence to support the jury’s determination that Thomas
committed the aggravated robbery of Roberts and Breed.  We therefore affirm the judgment of the trial
court.

 

 

 

                                                          Jane
Bland

                                                          Justice

 

Panel consists of Justices Keyes,
Higley, and Bland.

Do not publish.  Tex.
R. App. P. 47.2(b).