TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-05-00396-CR






Jerry Graham, Appellant


v.


The State of Texas, Appellee






FROM THE DISTRICT COURT OF CALDWELL COUNTY, 421ST JUDICIAL DISTRICT

NO. 2004-247, HONORABLE TODD A. BLOMERTH, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N



 The jury convicted appellant Jerry Graham of the offenses of sexual assault of a child
and indecency with a child. See Tex. Pen. Code Ann. § 22.011(a)(2)(C) (West Supp. 2005) (sexual
assault of a child); § 21.11(a)(1) (West 2003) (indecency with a child). In three issues on appeal,
Graham contests: (1) the admission, through the medical records exception to the hearsay rule, of
the complainant's hearsay statements to a counselor; (2) admission of the counselor's opinion
testimony regarding the reasons for the complainant's delayed outcry; and (3) the factual sufficiency
of the evidence to sustain the sexual assault conviction. We will affirm the judgment of the district
court.

BACKGROUND

 The jury heard evidence that 15-year-old G.M. was sexually assaulted by Graham,
her stepfather. G.M. testified that on two separate occasions, at night while G.M. was sleeping,
Graham came into her bedroom and "licked" her breasts and her genitals. We will review the
evidence concerning the nature of Graham's acts as necessary when addressing Graham's sufficiency
challenge.

 The incidents in question took place in January and April 2004. G.M. testified that
she informed her mother, Victoria Graham, about the incidents two days after the last one had
occurred. Victoria testified that she confronted Graham about G.M.'s allegations, and that he denied
them. The following day G.M. told her friend Rachel about what had happened. Rachel testified
that she told G.M. to tell their friend Natasha's mother about what had happened. Natasha's mother
worked as a dispatcher for the Luling Police Department. G.M. recounted that Rachel and Natasha's
mother took her to the police station. At the station, G.M. first spoke with Officer Joe Earle, a traffic
patrol officer. Officer Earle testified that once G.M. began telling him what had happened to her,
he immediately contacted Officer Jeff Goff, the investigator on duty. Earle testified that once Goff
arrived, Goff began interviewing G.M. and told Earle to contact Child Protective Services (CPS).

 While the officers were waiting for CPS, Graham and Victoria arrived at the police
station looking for their daughter. They were accompanied by G.M.'s younger sister. Earle testified
that he asked Graham to go outside with him. Earle testified that Graham followed him outside and
that Graham stated, "I know exactly what's going on" because Victoria had told him about G.M.'s
allegations. Earle testified that he responded to Graham that the allegations were "under
investigation," that Graham was not being detained, and that he was free to leave at any time. Earle
testified that Graham did not leave. 

 Officer Goff testified that when he interviewed G.M. she was "nervous, timid," and
that she was "biting her fingernails and didn't really want to talk." Goff testified that he interviewed
G.M. for approximately 10 to 20 minutes but did not ask her very detailed questions. He arranged
for G.M. to be transported to Roxanne's House, a children's advocacy center, for a comprehensive
interview. Goff testified that he observed the interview at Roxanne's House via closed-circuit
media, and that what "emerged from that interview" was consistent with what G.M. had told him
earlier. Goff also testified that he interviewed Victoria and G.M.'s sister the same night he
interviewed G.M., and that he later obtained statements from G.M.'s friends Rachel and Natasha,
and Natasha's mother.

 Sammye Sessions, the CPS supervisor for Hays and Caldwell Counties, responded
to the call from the Luling Police Department. She testified that she went to the station and
interviewed G.M., G.M.'s sister, and their mother. Sessions testified that after speaking with each
of them, she obtained permission from her superiors to perform an "emergency removal" of both
girls from their parents' custody. Sessions also observed G.M.'s interview at Roxanne's House, and
testified that G.M.'s statements during the interview were consistent with what G.M. had told her. 
Sessions also testified that it was common for children to have trouble recounting specific details
of sexual abuse.

 The jury also heard testimony from Gene Hartin, a licensed professional counselor. 
Hartin testified that in August 2004, G.M. was referred to him for therapy on several issues,
including sexual abuse. Hartin was G.M.'s therapist for approximately 10 months. Hartin testified
that after a "few months" of therapy, G.M. told Hartin that Graham had sexually abused her on three
occasions--once by "rubbing" her vagina, and two other times by "licking" her vagina. Hartin also
testified that G.M. had a low IQ in the range of 70 to 80, with 100 being the "average IQ of the
general population." Hartin explained to the jury, without objection, that G.M.'s age and "definitive
cognitive mental deficiencies" could have contributed to her not being able to recall specific details
of the sexual abuse. Hartin further testified, again without objection, that, in his opinion, G.M.
delayed making her outcry against Graham because doing so "would create a major disturbance in
the family that would impact on her mother's happiness."

 Graham was indicted on two counts of sexual assault of a child and two counts of
indecency with a child. Graham was first tried on these charges in April of 2005, but the jury could
not reach a verdict, resulting in a mistrial. In the second trial, the jury convicted Graham of all four
counts. Graham pleaded true to a prior conviction for aggravated sexual assault of a child, and the
court assessed punishment at life imprisonment. This appeal followed.


DISCUSSION


Hearsay statements

 In his first issue, Graham argues that the district court erred in admitting the
statements G.M. made to her counselor, Gene Hartin, under the medical diagnosis and treatment
exception to the hearsay rule. See Tex. R. Evid. 803(4).

 An appellate court reviewing a trial court's ruling on the admissibility of evidence
must utilize an abuse-of-discretion standard of review. Weatherred v. State, 15 S.W.3d 540, 542
(Tex. Crim. App. 2000). In other words, the appellate court must uphold the trial court's ruling if
it was within the zone of reasonable disagreement. Montgomery v. State, 810 S.W.2d 372, 391
(Tex.Crim.App. 1990). In addition, the appellate court must review the trial court's ruling in light
of what was before the trial court at the time the ruling was made. Weatherred, 15 S.W.3d at 542.

 Hearsay is a statement, other than one made by the declarant while testifying at trial
or hearing, offered in evidence to prove the truth of the matter asserted. Tex. R. Evid. 801(d).

 Hearsay is not admissible except as provided by statute or these rules or by other rules prescribed
pursuant to statutory authority. Tex. R. Evid. 802. One such provision is the "medical diagnosis or
treatment" exception, which allows the admission of hearsay "[s]tatements made for the purposes
of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain,
or sensations, or the inception or general character of the cause or external source thereof insofar as
reasonably pertinent to diagnosis or treatment." Tex. R. Evid. 803(4). Rule 803(4) is based on the
assumption that the patient appreciates that the effectiveness of the treatment may depend on the
accuracy of the information provided to the physician. Fleming v. State, 819 S.W.2d 237, 247 (Tex.
App.--Austin 1991, pet. ref'd).

 In Jones v. State, this Court explained:


The two-part test for admitting these statements [under rule 803(4)] is: (1) the
declarant must make the statements for the purpose of receiving medical treatment,
and (2) the content of the statement must be such as is reasonably relied on by a
physician in treatment or diagnosis. Thus, the declarant must first have a motive
consistent with obtaining medical care, knowing that proper diagnosis or treatment
depends upon the veracity of such statements. Further, the statement must concern
facts that are reasonably pertinent to diagnosis or treatment: medical history,
symptoms, or the cause or general character of the cause or external source.



92 S.W.3d 619, 622-23 (Tex. App.--Austin 2002, no pet.) (internal citations omitted). The policy
rationale underlying this exception is that a statement made with the intent to obtain medical
services, in the belief that proper diagnosis and treatment depends upon the truth of the statement,
carries special guarantees of trustworthiness. Id.

 Graham has not contended that Hartin is not a member of the medical profession or
providing care within the scope of rule 803(4). Cf. Jones, 92 S.W.3d at 623 n.5; see also Moore v.
State, 82 S.W.3d 399, 405 (Tex. App.--Austin 2002, pet. ref'd). He challenges, rather, the district
court's determination that G.M.'s statements were for the purpose of obtaining diagnosis or
treatment and concerned facts reasonably related to those purposes. Graham emphasizes that Hartin's
counseling concerned relationship issues and various topics other than sexual abuse. We have
previously held that statements elicited during counseling regarding "relationship issues, [the
complainant's] identity and self-esteem, the loss of [the complainant's] mother, [the complainant's]
sexualized behavior in the classroom, and bad dreams [the complainant] had," or counseling seeking
to "clarify exactly what is appropriate behavior and not appropriate behavior between a care-giving
adult and child" lack the guarantees of trustworthiness upon which rule 803(4) was founded. Perez
v. State, 113 S.W.3d 819, 827 (Tex. App.--Austin 2003, pet. ref'd); Jones, 92 S.W.3d at 626. 
Another factor on which we relied in Perez and Jones was that the statements were elicited over a
period of several months--also the case here.

 But our examination of the record reveals a closer question than in Perez and Jones.
Before permitting Hartin to testify, the district court held a hearing under rule of evidence 104 at
which the State elicited testimony concerning Hartin's treatment of G.M. as it bore upon rule 803(4):


Q: And do the conversations you have with [G.M.] relate to diagnosing and treating
the issues that led to her entering foster care?


A: My understanding, at the time, is that [G.M.] and her sister were removed from
her parents' care related to allegations that she had been sexually abused, and that has
been a topic focus of concern since I've worked with her.


. . . .


Q: Okay. Has this been a topic of conversation often or occasionally or just a few
times?

A: I would say frequently. Although, there are many other issues that we've focused
on with [G.M.]


Q: Okay. Let me ask you specifically. Have you ever directly asked her about the
circumstances relating to this sexual assault?


A: [G.M.] volunteered to me when I first met her that she had been sexually abused. 
At that time, she said she didn't really feel comfortable in talking about it, but that
she would later.


Q: Okay.


A: So some time passed before I specifically returned to focus on that subject with
her.


. . . .


Q: Okay. And what did she tell you at that time?


A: By that time, she was prepared to tell me what had happened --


Q: Okay.


A: -- which is, of course, an important -- an important step for them to discuss 

what happened.


Q: Is that -- is knowing specifically what happened, important to be able to treat --


A: Yes.


Q: -- her issues related to that?


A: Yes, it is. 


Q: Okay. What exactly did she tell you?


A: She told me that she had been molested by her stepfather on three separate
occasions --


Q: Okay.


A: -- following the marriage of her mother with her stepfather.

Q: Okay.


A: She said that on each of these occasions, it occurred in her bed at night.


Q: All right.


A: She would awaken and -- to find him doing -- become aware that he was doing
sexual things to her.


Q: Such as?


A: She said on the first occasion, I believe, that -- I think the way she put it was, he
was rubbing me --


Q: Okay.


A: -- referring to her vagina.


Q: Okay.


A: On the other two occasions, she said that he was licking me down there --


Q: Okay.


A: -- I believe is the way she put that. 



 Hartin went on to explain that a person's reaction to sexual abuse depends on many
variables, including who the alleged perpetrator was:


 Q: Okay. And does the degree and timing of reactions vary among people?


 A: Yes. It could vary quite a bit. Often the major variables in helping some -- in
being able to understand a specific traumatic experience is that the depth of the effect
has a lot to do with who the perpetrator was, if it was, for example, a stranger or if
it was someone who is expected to be trusted, such as a family member or a friend. 
It makes it more difficult to deal with.


Hartin thus testified that his eliciting of facts concerning G.M.'s sexual abuse was an important part
of her diagnosis and treatment. Further, he provided a treatment-related reason for the timing of her
statements. See Wilder v. State, 111 S.W.3d 249, 257 (Tex. App.--Texarkana 2003, pet. ref'd)
(statements by complainant to licensed professional counselor made over an extended period of time
concerning sexual abuse admissible under Rule 803(4)). Hartin also testified that an important part
of his work was ensuring that G.M. made truthful statements. We have held similar testimony to
support admission of child sexual abuse victim statements under rule 803(4). See Fleming, 819
S.W.2d at 247.

 However, we need not address whether the district court abused its discretion in
admitting G.M.'s statements through rule 803(4) because, even if it did, any error was harmless. The
erroneous admission of evidence is non-constitutional error. Tate v. State, 988 S.W.2d 887, 890
(Tex. App.--Austin 1999, pet. ref'd). Accordingly, we apply the harm analysis standard found in
Tex. R. App. P. 44.2(b). See Sexton v. State, 93 S.W.3d 96, 101 (Tex.Crim.App. 2002); Johnson
v. State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998); King v. State, 953 S.W.2d 266, 271 (Tex.
Crim. App. 1997). Under this standard, the error must be disregarded unless appellant's substantial
rights are affected. Tex. R. App. P. 44.2(b). Substantial rights are not affected by the erroneous
admission of evidence if the appellate court, after examining the record as a whole, has fair assurance
that the error did not influence the jury, or had but a slight effect. Motilla v. State, 78 S.W.3d 352,
355 (Tex. Crim. App. 2002); Johnson v. State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). In
assessing the likelihood that the jury's decision was adversely affected by the error, the appellate
court should consider everything in the record, including any testimony or physical evidence
admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character
of the alleged error and how it might be considered in connection with other evidence in the case. 
Motilla, 78 S.W.3d at 355. We may also consider the jury instructions, the State's theory and any
defensive theories, closing arguments, and even voir dire, if applicable. Id. at 355-56. We may also
consider whether the State emphasized the error. Id. at 356. Moreover, the improper admission of
evidence does not constitute reversible error if the same facts are proved by other properly admitted
evidence. See Brooks v. State, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999).

 We conclude that the admission of Hartin's testimony was harmless for reasons
including the following:


 1. G.M. testified to the same facts that were the subject of her hearsay
statements to Hartin. See id. (holding that any error in the admission of
hearsay testimony was harmless in light of other properly admitted evidence
proving same fact).


2. There were eight witnesses other than Hartin who testified to some extent
about G.M.'s allegations. Although most did not testify as to what
specifically G.M. told them, they did testify to certain facts from which a
rational jury could infer Graham's guilt: 


 

 Officer Earle testified on cross-examination that G.M. had indicated
to him that Graham had sexually assaulted her three times.



 

 G.M.'s friend Natasha testified that G.M. had told her that Graham
wanted to "lick her pussy" three nights in a row, and that on one
occasion, Graham had "held her down."



 

 G.M.'s mother Victoria testified that she had observed Graham
looking at G.M. in the bathroom through a crack between the door
frame and the door. Victoria also testified to an incident in which she
woke up one night and saw Graham "bolt" from her daughter's side of
their bedroom to the bathroom, and that Graham once complained
about the "revealing clothes" that G.M. wore. Victoria further testified
that G.M. once told her that Graham "would wake her up during the
night and ask if he could do certain things to her." When asked what
specifically G.M. told her, Victoria replied, "That he wanted to lick her
crotch and suck on her breasts."



 

 G.M.'s friend Rachel Martinez testified that G.M. told her something
that "bothered" her and that she told G.M. that she needed to "talk to
somebody about it." Rachel also testified about a statement in which
she wrote that G.M. told her that "she was scared of her stepdad."



 

 Natasha's mother Yvonne testified that when G.M. told her that she
"needed help," she decided to take her to the police department.




 Officer Goff testified that he interviewed G.M. and observed her
interview at Roxanne's House. He testified that "what emerged from
that interview" was "consistent with what G.M. had told [him]
earlier."



 

 Sammye Sessions, a CPS supervisor for Hays and Caldwell Counties,
also interviewed G.M. and observed her interview at Roxanne's
House. She testified that G.M.'s statements during that interview were
consistent with what G.M. had told her. 



 

 Erin Tirrell, the forensic interviewer in this case, testified about her
interview with G.M. and how G.M. used anatomical drawings to
describe what had happened to her.


 

 3. Hartin was the second-to-last witness to testify for the State, and the hearsay
statements Hartin testified to were merely cumulative of the testimony the
jury had already heard:



 Hartin testified that G.M. told him that Graham had sexually assaulted
her. G.M.'s friend Rachel and Officer Earle testified to the same facts.



 

 Hartin testified about the details of the sexual assault. G.M. testified
to the same facts.



4. The vast majority of Hartin's testimony was not hearsay. In fact, the State
only asked Hartin two questions about the statements G.M. made to him, and
his answers were less specific than the answers he provided to the court
during the Rule 104 hearing outside the jury's presence:


 Q: And without necessarily getting into too many specifics, what did she
indicate was the nature of the abuse?


 A: She told me that she had--she was in her bed. She awakened to find
her stepfather--I think the way she put that was
rub--rubbing--rubbing me down there, referring to touching her
vagina. The--she talked about two other instances with me, and on
both those occasions, the similarity where she was in her bed. She
awakened, but then she found him licking me down there, is the way
she put it.


 Q: Okay. Did she point or indicate where she was talking about?


 A: Referring to her vagina, and I asked her for clarification. There's no
doubt that's what she meant.


That was the extent of Hartin's testimony about what G.M. told him about the abuse. 
The rest of Hartin's testimony related to other matters, such as G.M.'s mental
abilities and the effects of the abuse.


5. The State did not mention Hartin in its opening statement and only briefly
mentioned Hartin's testimony in its closing argument, which suggests that his
testimony was not an integral part of the State's case.


 After examining the record as a whole, we have fair assurance that the admission of
Hartin's testimony concerning G.M.'s statements did not influence the jury or had but a slight effect. 
See Garcia v. State, 126 S.W.3d 921, 927 (Tex. Crim. App. 2004). We overrule Graham's first issue.


Opinion testimony

 In his second issue, Graham asserts that the district court erred in admitting Hartin's 

opinion testimony regarding the reason for G.M.'s delayed outcry. When Hartin offered his opinion
on this matter, however, Graham did not object. To preserve error, the record must show that
appellant made a timely request, objection, or motion, and that the trial court ruled on it. Tex. R.
App. P. 33.1(a)(1). Graham has not preserved error and, therefore, we overrule his second issue.


Factual sufficiency

 In his third issue, Graham asserts that the evidence is factually insufficient to prove
that his mouth contacted G.M.'s sexual organ on two separate occasions. Graham contends that
G.M. testified that during the first incident Graham licked her breasts, but did not touch her vagina.

 In a factual sufficiency review, we view the evidence in a neutral light and will set
aside a verdict only if the supporting evidence is so weak that the verdict is clearly wrong or the
contrary evidence is so strong that the jury could not have found all the elements of the crime beyond
a reasonable doubt. Prible v. State, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005). A verdict is
clearly wrong and unjust if the "jury's finding is 'manifestly unjust,' 'shocks the conscience,' or
'clearly demonstrates bias.'" Id. (quoting Santellan v. State, 939 S.W.2d 155, 164 (Tex. Crim. App.
1997)). All the evidence is considered equally, including the testimony of defense witnesses and the
existence of alternative hypotheses. Orona v. State, 836 S.W.2d 319, 321 (Tex. App.--Austin 1992,
no pet.). We consider all the evidence, rightly or wrongly admitted. See Camarillo v. State, 82
S.W.3d 529, 537 (Tex. App.--Austin 2002, no pet.) Although due deference must be accorded the
fact-finder's determinations, particularly those concerning the weight and credibility of the evidence,
the reviewing court may disagree with the result in order to prevent a manifest injustice. Johnson
v. State, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000). The evidence will be deemed factually insufficient
to sustain the conviction if the proof of guilt is too weak or the contrary evidence is too strong to
support a finding of guilt beyond a reasonable doubt. Zuniga v. State, 144 S.W.3d 477, 484-85 (Tex.
Crim. App. 2004); see Johnson, 23 S.W.3d at 11.

 The indictment alleged that Graham sexually assaulted G.M. on two separate
occasions "by causing the sexual organ of [G.M.] to touch the mouth of [Graham]." G.M. testified
to three separate incidents involving Graham--two involving touching and a third involving only
solicitation. Initially, G.M. testified that Graham did not touch her sexual organ during the first
incident:


 Q: Where was he touching you?

 A: On my breasts. 

 . . . .

 Q: Okay. And did he touch you anywhere else?

 A: I don't think it was the first -- I mean, I don't think so on the first time.


 G.M. then testified that Graham touched her sexual organ during the second incident:



 Q: And on that occasion, what happened?


 A: He was licking my -- I mean, he was licking my breasts and he was licking my
crotch.


 Q: Okay. Both places?


 A: Yes.


 Q: Was that same or different from the time before?




 A: It was different, I think.


 Q: Okay.


 A: Yeah.


 Q: Because now he's touching both places?


 A: Yes.



 G.M. testified that there was a third incident when she awoke to find Graham in her
bedroom telling her that she "turned him on and that he wanted to lick [her] crotch." However, G.M.
testified that Graham did not touch her on this occasion.

 Later on during her testimony, G.M. changed her story about what had happened
during the first incident. In an effort to refresh her memory, the State referred to diagrams of the
female body in which G.M. had, during the first trial, circled the areas in which Graham had touched
her. These diagrams were admitted into evidence. The State inquired into G.M.'s markings on the
diagrams:

 Q: How many circles are around the crotch?

 A: Two.

 Q: And are those circles different in some way on [State's Exhibit] 1A?

 A: Yes.

 Q: How are they different?

 A: There's a blue mark and a red -- I mean, and a black.



 Q: Okay. Do you remember making those marks?

 A: Yes.

 . . . . 

 Q: And do you remember saying that he touched you on the crotch?

 A: Yes.

 Q: When you talked to me before, how many times did you say he touched you in
your crotch?


 A: Like this morning or --


 Q: Well, yeah, this morning how many times did you say?


 A: One or two. I'm not sure.


 Q: Okay. How many did you tell me before? Do you remember?


 A: Two.


 Q: Okay. And were those at the same time or different times that he touched you in
your crotch?


 A: Different.


 Q: Okay. Are those the two times that we're talking about today?


 A: Yes.



 On cross-examination, Graham inquired into this apparent inconsistency in G.M.'s
testimony:




 Q: Okay. And the second thing I wanted to ask you is the first incident which
occurred ... initially you told us that he didn't do anything with your crotch, correct?


 A: Yes.


 Q: Okay. Isn't it true that you've given prior testimony also that indicates that you
testified that Mr. Graham licked your crotch twice on that particular occasion. Is that
true?


 A: Yes.


 Q: That is true?


 A: Yes.


 Q: It happened twice on that one day?

 

 A: Well, not on the same day.


 Q: Okay. Well, I want to -- do you recall testifying that -- saying that you -- he
licked my crotch twice in prior testimony?


 A: Well, that's for the first and second time.


 . . . .


 Q: Okay. So is it true that he licked your crotch twice on that one occasion?


 A: Yes.


 Q: That is true. But you didn't testify to that before, did you?


 A: No.



 The jury is the sole judge of the credibility of the witnesses and the weight to be given
the evidence, and may choose to believe all, some, or none of it. Margraves v. State, 34 S.W.3d 912,
919 (Tex. Crim. App. 2000); Rachal v. State, 917 S.W.2d 799, 805 (Tex. Crim. App. 1996); Skillern
v. State, 890 S.W.2d 849, 879 (Tex. App.--Austin 1991, pet. ref'd). Thus, the jury is permitted to

 believe or disbelieve any part of the testimony of any witness. Jones v. State, 984 S.W.2d 254, 258

(Tex. Crim. App. 1998). Reconciliation of evidentiary conflicts is solely a function of the trier of
fact. Losada v. State, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986); Bowden v. State, 628 S.W.2d
782, 784 (Tex. Crim. App. 1982); Perez v. State, 960 S.W.2d 84, 86 (Tex. App.--Austin 1997, no
pet.) (citing Chambers v. State, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991)). The jury could have
accepted that portion of G.M.'s testimony sufficient to support the convictions and disregarded the
inconsistencies. See Perez, 113 S.W.3d at 839. "A decision is not manifestly unjust because the jury
resolved the manifestly conflicting views of the evidence in favor of the State." Cain v. State, 958
S.W.2d 404, 409 (Tex. Crim. App. 1997). Also, CPS supervisor Sammye Sessions provided
testimony explaining why G.M.'s testimony might have been inconsistent, and the jury could have
chosen to credit this testimony in reconciling the conflicts in the evidence. 

 The jury also heard testimony from Hartin that G.M. told him that Graham had
touched her vagina on more than one occasion. However, even if this testimony had been excluded,
as Graham contends it should have been, the testimony of a child victim alone is sufficient to support
a conviction for sexual assault. See Tex. Code Crim. Proc. Ann. art. 38.07(b) (West Supp. 2003);
Perez, 113 S.W.3d at 838. We also note that Graham did not testify, so the jury did not hear a
contrary version of the alleged incidents. 

 Considering all the evidence in a neutral light, and giving due deference to the jury's


 resolution of conflicts in the evidence, we do not believe the proof of guilt is too weak or the

 contrary evidence is too strong to support a finding of guilt beyond a reasonable doubt. Zuniga, 144
S.W.3d at 484-85. We overrule Graham's third issue.


CONCLUSION

 Having overruled Graham's issues on appeal, we affirm the judgment of the district 

court.



 

 Bob Pemberton, Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Affirmed

Filed: September 8, 2006

Do not publish