Opinion filed June 26, 2008











 
 
  
 
 







 
 
  
 
 




Opinion filed June 26,
2008

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                   __________

 

                                                          No. 11-07-00101-CR 

                                                     __________

 

                               ANGEL
VICTOR VASQUEZ, Appellant

 

                                                             V.

 

                                        STATE
OF TEXAS, Appellee

 



                                        On
Appeal from the 132nd District Court 

 

                                                          Scurry
County, Texas

 

                                                     Trial
Court Cause No. 9074

 



 

                                                                   O
P I N I O N

Angel
Victor Vasquez was indicted for capital murder.  The jury convicted him of the
lesser included offense of causing serious bodily injury to a child and
assessed his punishment at ninety-nine years confinement and a $10,000 fine. 
We affirm.

I.
Background Facts








Vasquez
and Tracy Luna were common-law married.  They had two daughters:  four-year-old
B.N.L.V. and two-year-old Natalie Vasquez.  During the early morning hours of
May 11, 2005, emergency officials were dispatched to Luna and Vasquez=s house because of a report
that a two-year-old child was having cardiac arrest.  Paramedics arrived and
administered CPR to Natalie.  She had no electrical activity in response to an
EKG, and so she was taken to the hospital.  Because Natalie had numerous
bruises, paramedics requested that a law enforcement officer meet them at the
emergency room.  Natalie was pronounced dead at the hospital.  The medical
examiner=s office
conducted an autopsy and determined that Natalie died of complications of blunt
force trauma and neglect.

Luna
and Vasquez were indicted for capital murder.  The State alleged that they
knowingly and intentionally caused Natalie=s
death by failing to provide her with medical care or adequate food. The State
was subsequently allowed to amend the indictments to include a contention that
Luna and Vasquez had a duty to act because they were Natalie=s parents.  Luna and
Vasquez were tried together.  The jury acquitted them of capital murder but
found them guilty of the lesser included offense of intentionally or knowingly
causing serious bodily injury to a child.  The jury assessed each defendant=s punishment at ninety-nine
years confinement and a $10,000 fine. 

                                                                                                                       
II. Issues on Appeal

Vasquez
challenges his conviction with six issues.  Vasquez argues that the evidence
was legally and factually insufficient, that the trial court erred by allowing
the State to amend the indictment, that the trial court erred by including the
lesser included offenses of injury to a child, and that the trial court erred
by admitting hearsay evidence.  Finally, Vasquez adopts by reference any issues
raised by Luna in her brief.

                                                                            
                                                     III.  Analysis

A.
Was the Evidence Legally and Factually Sufficient? 

Vasquez
argues that the evidence is insufficient because the evidence of his intent
establishes no more than criminal negligence.

1.  Standard of Review. 








To
determine if the evidence is legally sufficient, we review all of the evidence
in the light most favorable to the verdict and determine whether any rational
trier of fact could have found the essential elements of the crime beyond a
reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979); Jackson
v. State, 17 S.W.3d 664, 667 (Tex. Crim. App. 2000).  The jury was the sole
judge of the credibility of the witnesses and the weight to be given their
testimony.  Tex. Code Crim. Proc. Ann. art.
36.13 (Vernon 2007), art. 38.04 (Vernon 1979).  The jury may choose to believe
or disbelieve all or any part of any witness=s
testimony.  Sharp v. State, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986).

To
determine if the evidence is factually sufficient, the appellate court reviews
all of the evidence in a neutral light.  Watson v. State, 204 S.W.3d
404, 414 (Tex. Crim. App. 2006).  Then, the reviewing court determines whether
the evidence supporting the verdict is so weak that the verdict is clearly
wrong and manifestly unjust or whether the verdict is against the great weight
and preponderance of the conflicting evidence. Id. at 414-15.

The
appellate court reviews the factfinder=s
weighing of the evidence and cannot substitute its judgment for that of the
factfinder.  Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997); Clewis
v. State,922 S.W.2d 126, 133 (Tex. Crim. App. 1996).   Due deference must
be given to the factfinder=s
determination, particularly concerning the weight and credibility of the
evidence.  Johnson v. State, 23 S.W.3d 1 (Tex. Crim. App. 2000); Jones
v. State, 944 S.W.2d 642 (Tex. Crim. App. 1996).

A
person commits an offense if he intentionally or knowingly causes injury to a
child by act or by omission if he has a duty to act. Tex. Penal Code Ann. '
22.04 (Vernon Supp. 2007).  Parents have a duty to care for, to control, to
protect, and to provide medical care to their children.  Tex. Fam. Code Ann. '
151.001(a)(2), (3) (Vernon Supp. 2007).  Injury to a child is a result of
conduct offense.  Alvarado v. State, 704 S.W.2d 36, 39 (Tex. Crim. App.
1985).  Therefore, the State must  prove not only that Vasquez failed to
provide adequate food and medical care but also must prove that he
intentionally or knowingly caused Natalie=s
injury.  Johnston v. State, 150 S.W.3d 630, 634 (Tex. App.CAustin 2004, no pet.).   A
person acts intentionally when it is his conscious desire to engage in the
conduct or to cause the result.  Tex.
Penal Code Ann. '
6.03(a) (Vernon 2003).  A person acts knowingly with respect to a result of his
conduct when he is aware that his conduct is reasonably certain to cause the
result.  Tex. Penal Code Ann. ' 6.03(b) (Vernon 2003). 
Serious bodily injury is injury that creates a substantial risk of death or
that causes death, serious permanent disfigurement, or protracted loss of
impairment of the function of any bodily member or organ. Tex. Penal Code Ann. ' 1.07 (a)(46) (Vernon Supp.
2007).








2.  Legal Sufficiency.[1]

Natalie
was born on December 2, 2002, and was a normal size baby.  Dr. Gustavo Gross
saw her for a two-week checkup.  She was doing well, had gained some weight
since birth, and weighed 7.7 pounds.  Dr. Gross did not see her again as a
patient until January 14, 2004.  Even though Natalie was thirteen months old,
she only weighed 13.4 pounds.  Natalie appeared dehydrated, malnourished, and
hyperglycemic.  Dr. Gross made arrangements for Natalie to be hospitalized and
seen by a specialist in Lubbock.

Dr.
James V. Higgins was responsible for her treatment in Lubbock.  Dr. Higgins
testified that when Natalie arrived there were questions about her liver
function because of test results but that over two days her liver enzymes had
dropped dramatically.  Dr. Higgins testified that essentially all they did was
feed Natalie.  During the forty-eight hours she was hospitalized, Natalie took
in more food than expected, and she achieved a significant weight gain, going
from 5.8 to 6.4 kilos.  This equates to a weight gain of approximately 1.3
pounds.  Dr. Higgins described Natalie as a hungry child who wanted to eat.

Dr.
Higgins saw Natalie two weeks after her hospital discharge for a follow-up
visit.  She looked good.  Dr. Higgins recommended replacing Natalie=s milk with PediaSure to
provide more calories.  He did not recommend withholding solid food, but Luna
began telling relatives that Natalie could not handle solid food.  Later,
Natalie was only allowed to eat small amounts of solid food.








Dr.
Gross also saw Natalie shortly after her discharge.  He testified that he
stressed to Luna the need to keep any follow-up appointments with the
specialist and that he told her to take Natalie back to the doctor if she
started to lose weight.  Dr. Gross next saw Natalie on April 26, 2004.  Natalie
had the worst case of impetigo that he had ever seen.  Dr. Gross testified that
he was concerned.  He treated Natalie with an ointment and an oral antibiotic. 
He saw her for follow-up visits on April 27 and April 28.  The April 28 visit
was the last time he saw Natalie as a patient.  Dr. Gross testified that,
if he had seen a child that looked like Natalie did when she arrived at the
emergency room, he would have called the authorities.  Dr. Gross testified that
Luna and Vasquez should have been extremely concerned about Natalie=s weight, that he would
have expected them to recognize impetigo when it returned, and that he would
have expected them to seek medical treatment for it.  He also testified that
they were neglectful for not doing so.

Dr.
Thomas Lloyd Kerr saw Natalie when paramedics brought her body to the emergency
room.  He testified that, if the authorities had not already been alerted, her
injuries would have required him to do so.  She had multiple bruises on her
face, abdomen, back, hips, left leg, and behind her left ear.  These bruises
were too well-defined to have been caused by a fall.  Natalie had a decubitus
ulcer on her sacrum that went through the epidermis to the bone.  It was
infected, and it would have been painful for her.  When Dr. Gross saw Natalie
in April 2004, she weighed twenty-two pounds.  When Natalie died on May 11,
2005, her weight had dropped to seventeen pounds.

Justice
of the Peace Debra Boyd was called to the hospital.  She saw Natalie=s body and testified that a
parent should have known Natalie needed medical attention.  Sheriff Darren
Jackson was one of the law enforcement officers dispatched to the hospital, and
he too saw Natalie=s
body.  He testified that she looked six months old; that he would have realized
she needed medical attention; and that, if he had seen Natalie in this
condition, he would have taken custody of her and would have taken her to the
emergency room.  Sheriff Jackson contacted CPS and requested its assistance
because he wanted to have Luna and Vasquez=s
oldest child removed from their home. 

Judge
Boyd authorized an autopsy.  Dr. Sridhar Natarajan, Chief Medical Examiner for
Lubbock County and the doctor responsible for Natalie=s autopsy, testified that there were several
indications that Natalie had not been fed properly.  These included the loss of
body fat, reduced thickness of muscle, fluid accumulating in the peritoneal
cavity, and the brittleness of her hair.  During the autopsy, doctors
identified twenty-four well-healed scars, sixty-one bruises, two previously
fractured ribs, and a staph infection in her blood.  They found little to no
fat on her chest wall and around her bowel.  The medical examiner=s office determined that
the cause of death was complications from blunt force trauma and neglect.

Even
Vasquez=s expert Dr.
Robert Lloyd White agreed that Natalie was malnourished, that she died from
protein-calorie malnutrition, and that she had extensive bruises of a
suspicious nature. He would have included battered baby syndrome as a
contributing condition and homicide as the manner of death if he had done the
autopsy.  He believed that Natalie needed medical attention.








Vasquez
knew that Natalie was losing weight.  He and Luna talked about it.  He also
knew that if he took Natalie to a doctor they would see her bruises and might
reach an opinion about what he had been doing to her.  He knew about Natalie=s open sore.  Vasquez=s mother talked to him and
Luna about Natalie=s
weight and she told them to take Natalie to a specialist because she could see
that there was something wrong with Natalie.  Vasquez=s father thought they were taking Natalie to
the doctor but found out after her death that this was untrue. 

Kerrie
Blair, a CPS investigator, went to Luna and Vasquez=s residence.  She asked to see the cream Luna
told law enforcement officials she had been using to treat Natalie=s ulcer.  Luna told her
that it had been thrown away and was unable to produce any medication.  Luna
claimed that she had also been using Neosporin to treat Natalie=s ulcer but told Blair that
they had been out of it for a couple of days.  Luna agreed that she did not
have any of the cream she had previously received from Dr. Gross but claimed
that Blair was lying when she said that there was no Neosporin in the house.

Blair
testified that PediaSure was available free of charge from the WIC program. 
She testified that she learned during her investigation that Luna had gotten
into a disagreement with the WIC nurse and that she stopped going to the WIC
office.  Blair testified that she learned Natalie was not allowed to get food
when she wanted and that, if she attempted to do so, she was punished.  Luna
and Vasquez=s two
dogs, however, appeared well-fed.

Vasquez
gave Sheriff Jackson a statement the day Natalie died.  Vasquez said that
Natalie had always been small, had trouble gaining weight, and had suffered
from health problems since her birth.  He said Natalie was clumsy, bruised
easily, scratched herself, and bit her lip.  He denied spanking his kids.  At
trial, Vasquez testified that Natalie ate a lot and that he did not take her to
a doctor because he did not see any sign that anything was wrong with her.  He
knew that Natalie was losing weight, although he denied that any doctor ever
told them to take Natalie to the doctor if this occurred.  He testified that he
did not take Natalie to the doctor for her bruises because he did not think
they bothered her enough to go to the doctor.








The
evidence is legally sufficient.  Vasquez argues that there was no evidence that
he was aware with reasonable certainty that Natalie=s death would have been prevented by taking
her to the doctor.  This is not the specific question we must address because
Vasquez was not convicted of capital murder.  The question is whether Vasquez
intentionally or knowingly caused Natalie serious bodily injury by failing to
provide adequate food or medical care. Natalie died of malnutrition and had a
number of other health-related issues.  Vasquez knew that Natalie had lost
weight.  The jury could have believed the doctors=
testimony that they told Luna and Vasquez to take Natalie back to the doctor if
she lost weight.  Vasquez knew that Natalie had an open ulcer with exposed
bone, and Vasquez had been encouraged by relatives to feed Natalie more or to
take her to a doctor.  The number of bruises and scars on Natalie=s body would have caused
any healthcare provider concern and may explain why he did not take Natalie to
the doctor and why Luna and Vasquez lied to relatives about doing so.  Vasquez
was not prevented from taking Natalie to the doctor, acquiring medication for
her ulcer or impetigo, or feeding her.  Each of these was the result of a
conscious decision with knowledge that Natalie=s
health was being risked.  Furthermore, there was testimony from impartial
witnesses that Natalie=s
appearance alone indicated the need for medical attention B testimony definitively
corroborated by the emergency room photographs.  

3.  Factual Sufficiency.  

Vasquez
argues alternatively that, if the evidence is legally sufficient, it is
factually insufficient.  Vasquez notes that Natalie was small; but he points to
testimony that Luna was only 4'10" and weighed eighty-five  pounds, that
Natalie ate until she was full, and that Natalie was only denied sweets between
meals.  The jury as the factfinder was authorized to resolve any conflicts in
the evidence concerning Natalie=s
care and treatment.  Consequently, the mere fact that Vasquez denied any
wrongdoing does not make the evidence factually insufficient.  Issue one is
overruled.              B.  Did the Trial Court Err by Allowing the State to
Amend the Indictment? 

Vasquez
argues that the trial court erroneously allowed the State to amend the
indictment because it charged him with additional felony offenses in violation
of Tex. Code Crim. Proc. Ann.
art. 28.10(c) (Vernon 2006) and that the trial court erred further by including
lesser included charges of injury to a child in the jury charge in violation of
Tex. Code Crim. Proc. Ann. art.
1.05 (Vernon 2005).  The State responds that the amendment merely added a
missing element to the charged offense and, therefore, did not allege a new
offense.








Vasquez
was indicted for capital murder.  The State alleged that Vasquez intentionally
or knowingly caused Natalie=s
death by failing to provide her with adequate food or medical care and that, at
the time of her death, Natalie was less than six years old.  The State filed a
motion to amend the indictment by adding an allegation that Vasquez had a duty
to act because he was Natalie=s
parent.  The trial court granted this motion over Vasquez=s objection.

Vasquez
reasons that this amendment charged him with new offenses because the amended
indictment exposed him to additional lesser included offenses and that it was
error to include these new offenses in the jury charge because he was not
properly indicted for them.  Vasquez acknowledges that the original indictment
vested the trial court with jurisdiction, that a conviction for murder would
have been authorized under it, and that the indictment could have possibly
authorized convictions for the lesser included offenses of manslaughter and
criminally negligent homicide.  But he argues that it would not have authorized
a conviction for injury to a child by omission because it did not allege a duty
to act.  Vasquez concludes that the amendment alleged an additional or
different statutory offense because the duty allegation now authorized the
submission of injury to a child by omission.

The
Court of Criminal Appeals has interpreted Article 28.10(c) to mean that an
amended indictment must allege a different statutory offense, not merely
add a missing element or change the name of a complainant before it violates
the statute. Flowers v. State, 815 S.W.2d 724, 728-29 (Tex. Crim. App.
1991).  The amendment, on its face, did not allege a different statutory
offense.  Vasquez does not refer us to, nor have we been able to locate, a case
that holds that an indictment is improper if it increases the scope of
potential lesser included offenses or that it is improper to include lesser included
offenses raised by an amended indictment in the jury charge.








Vasquez=s analysis would require
the State to return to the grand jury every time a proposed amendment increases
the possible lesser included offenses that might be raised by the
evidence and, therefore, that might be included in the proposed charge. 
Article 28.10(c) imposes no such obligation, and we can divine no requirement
from the general principles governing indictments.  If Vasquez=s concern is that he did
not receive the benefit of a grand jury review of the injury to a child
allegations, we note that the State is not required to make specific
allegations of lesser included offenses.  See Eastep v. State, 941
S.W.2d 130, 134 (Tex. Crim. App. 1997) (the greater offense necessarily
includes all the lesser included offenses whether each of their constituent
elements are alleged in the wording of the indictment on the greater offense or
not).  Consequently, we cannot say that the grand jury was required to
specifically address the possibility that injury to a child might become a
relevant allegation.  Moreover, because the evidence was legally and factually
sufficient to support the conviction, a grand jury review would have provided
Vasquez with no clear benefit.  If Vasquez=s
concern is that the amendment impacted his ability to prepare a defense, this
is better handled by a motion for continuance.  Issues two and three are
overruled.

C. 
Did the Trial Court Erroneously Admit Hearsay Evidence? 

The
State called Leann Hicks as a witness.  Hicks was a licensed professional
counselor and was asked by CPS to provide grief counseling to Vasquez=s oldest daughter,
B.N.L.V.  The trial court conducted a hearing outside the presence of the jury
to determine the admissibility of statements made to Hicks by B.N.L.V.  The
trial court held that these statements were admissible pursuant to Tex. R. Evid. 803(4).[2] 
Vasquez argues that the trial court erred when it admitted B.N.L.V.=s statements because a
licensed professional counselor is per se neither a medical diagnostician nor a
medical treatment provider. 

We
review the trial court=s
admission of evidence under an abuse of discretion standard.  Weatherred v.
State, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).  A trial court does not
abuse its discretion if its ruling is within the zone of reasonable
disagreement.  Id.  We will uphold a trial court=s evidentiary ruling if it is reasonably
supported by the record and is correct under any theory of applicable law.  Martin
v. State, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005).








Texas
courts have allowed a wide range of non-physicians to testify under Rule
803(4).  See, e.g., Taylor v. State, No. 01-05-01183-CR, 2007 WL 2214859
(Tex. App.CHouston
[1st Dist.] Aug. 2, 2007, pet. granted) (licensed professional counselor); 
Horner v. State, 129 S.W.3d 210, 219 (Tex. App.CCorpus Christi 2004, pet. ref=d) (medical social worker);
 Wilder v. State, 111 S.W.3d 249, 256 (Tex. App.CTexarkana 2003, pet. ref=d) (licensed professional
counselor); Puderbaugh v. State, 31 S.W.3d 683, 685 (Tex. App.CBeaumont 2000, pet. ref=d) (clinical social
worker); Gohring v. State, 967 S.W.2d 459, 461 (Tex. App.CBeaumont 1998, no pet.)
(play therapist working under the supervision of a licensed psychologist); Moyer
v. State, 948 S.W.2d 525, 527-28 (Tex. App.CFort
Worth 1997, pet. ref=d)
(paramedic); Torres v. State, 807 S.W.2d 884, 886-87 (Tex. App.CCorpus Christ 1991, pet.
ref=d) (emergency room
nurse);  Macias v. State, 776 S.W.2d 255, 258-59 (Tex. App.CSan Antonio 1989, pet. ref=d) (psychologist).

Vasquez
essentially argues that these decisions are wrong and asks us to follow
decisions from the Austin Court of Appeals that he contends stand for the
proposition that Rule 803(4) is limited to medical treatment and, therefore,
does not encompass mental-therapeutic treatment unless it is part of diagnosing
and treating a medically treatable condition, such as schizophrenia.  Vasquez
cites Perez v. State, 113 S.W.3d 819 (Tex. App.CAustin 2003, pet. ref=d) and Moore v. State, 82 S.W.3d 399
(Tex. App.CAustin
2002, pet. ref=d.). 
In Moore, the court held that the trial court erred by admitting
testimony from a clinical social worker under Rule 803(4) because the State
failed to carry its burden of proof to establish the applicability of the
exception. Id. at 404-05.  The court reached a similar result in Perez,
in a case involving a counselor=s
testimony.  113 S.W.3d at 829-30.  We note, however, that in its most recent
decision in this area, the Austin Court affirmed the admission of a clinical
social worker=s
testimony under Rule 803(4).  Gibson v. State, No. 03-07-00191-CR, 2007
WL 4207824 (Tex. App.CAustin
Nov. 29, 2007, no pet.) (mem. op., not designated for publication).

There
is some dicta in the Perez decision that supports Vasquez=s contention.  For example,
the court wrote that the challenged statements were inadmissible because the
social worker Awas not
shown to be a medical professional@
and because Athe
statements were made during an extended period of counseling and did not
possess the guarantees of trustworthiness on which the medical diagnosis and
treatment exception to the hearsay rule is founded.@  113 S.W.3d at 827.  One can, however, draw
too broadly with this brush.  Even in Moore, the court noted that in
child abuse cases the victim=s
statement identifying their attacker is admissible because the child=s treatment begins with
removing the child from the abusive setting.  82 S.W.3d at 403.  Clearly then,
the court recognized that Rule 803(4) will in appropriate circumstances have
broader application than statements made to medical doctors or similar medical
professionals for the treatment of a medically-treatable condition.








We
believe the Austin Court is advocating a two-part analysis whenever the State
seeks to use Rule 803(4) beyond statements made to medical doctors.  First, the
State must prove that the witness has the training to diagnose or treat a
medical condition.  In this context, a medical condition would necessarily
include illnesses such as schizophrenia as contended by Vasquez, but it would
also encompass conditions such as child abuse,[3]
post-traumatic stress disorder, and depression.[4] 
Second, the State must prove that the statement was made as part of the
diagnosis or treatment process.  

The
trial court did not abuse its discretion by finding that Hicks=s testimony was
admissible.  Hicks was licensed by the State of Texas as a professional
counselor and had seventeen years experience.  She had a bachelor=s degree in sociology and a
master=s degree in
education with an emphasis in guidance and counseling.  Hicks was licensed to
supervise other counselors, which means that she had completed three thousand
hours of post-graduate work under a licensed supervisor. 

Hicks
testified that she took steps to determine whether B.N.L.V. understood that
truthfulness would help her improve, that she verified B.N.L.V.=s appreciation of the
difference between the truth and a lie, and that B.N.L.V. recognized that the
counseling process was helping her.  Hicks testified that she utilized B.N.L.V.=s statements to diagnose
and treat B.N.L.V. and that this is the type of information upon which
counselors normally rely.  She said that she ultimately diagnosed B.N.L.V. with
post-traumatic stress disorder, adjustment disorder mixed with anxiety, depression,
and bereavement. 

This
was sufficient evidence to inform the trial court=s
exercise of discretion and to address the concerns raised by the Austin Court. 
The State carried its burden to establish that Hicks had the education and
training to diagnosis and treat B.N.L.V., that B.N.L.V.=s statements to her were part of the diagnosis
and treatment process, and that B.N.L.V. adequately understood the need for
truthfulness. Issues four and five are overruled.  

D. 
Issues Adopted by Reference to Luna=s
Brief.








Vasquez
has adopted by reference all issues raised by Luna in her brief pursuant to Tex. R. App. P. 9.7.  The State argues that
this is inappropriate because Luna=s
appeal is not part of this case but is a separate appeal.  This issue we need
not decide because by separate opinion we have today affirmed Luna=s conviction.  Luna v.
State, No. 11-07-00141-CR (Tex. App.CEastland
June 26, 2008, no pet. h.).  Thus, even if Vasquez=s adoption is appropriate, no error is shown. 
Vasquez=s adoption by
reference issue is overruled.

IV. 
Holding

The
judgment of the trial court is affirmed.

 

 

RICK STRANGE

JUSTICE

 

June 26, 2008  

Publish.  See
Tex. R. App. P. 47.2(b).

Panel consists of:  Wright, C.J.,

McCall, J., and
Strange, J.









[1]Vasquez challenges the admission of a counselor=s testimony by separate issue.  We are required to
consider a legal sufficiency challenge before a challenge to the admission of
evidence.  To simplify our review, we are not considering the challenged
evidence in our legal or factual sufficiency analysis.  





[2]This exception allows for admission of the following
hearsay statements:

 

(4) Statements for Purposes of Medical Diagnosis or Treatment. 
Statements made for purposes of medical diagnosis or treatment and describing
medical history, or past or present symptoms, pain, or sensations, or the
inception or general character of the cause or external source thereof insofar
as reasonably pertinent to diagnosis or treatment.





[3]See, e.g., Fleming v. State, 819 S.W.2d 237, 247 (Tex. App.CAustin 1991, pet. ref=d).





[4]See, e.g., Gibson, 2007 WL 4207824 at *2.