NUMBER 13-09-168-CR



COURT OF APPEALS


 

THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


ROLAND R. FERNANDEZ, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 187th District Court 

of Bexar County, Texas.

 


MEMORANDUM OPINION


Before Justices Rodriguez, Benavides, and Vela


Memorandum Opinion by Justice Vela



 A jury convicted appellant, Roland R. Fernandez, of twelve counts of aggravated
sexual assault of a child, see Tex. Penal Code Ann. § 22.021 (Vernon Supp. 2009), and
two counts of indecency with a child by exposure. See id. § 21.11(a)(2)(A). The jury
assessed punishment at twenty-five years' imprisonment for each count of aggravated
sexual assault of a child and five years' imprisonment for each count of indecency with a
child. All of the sentences are to run concurrently. In five issues, appellant challenges the
factual sufficiency of the evidence to support his convictions and complains that this Court
lacks jurisdiction to hear this appeal. We affirm. (1)

I. Factual Background


A. State's Evidence

 When S.A. (2) was four or five years old, her parents divorced, and she began living
in San Antonio with her mother, G.A. Because G.A. worked, S.A. spent every other
weekend at the home of G.A.'s sister-in-law, Salina Fernandez, and Salina's husband,
appellant. S.A. testified appellant sexually abused her numerous times during the
weekends she spent with Salina and appellant. She did not remember the dates that the
abuse occurred; however, she testified the abuse happened when she was between five
and six years old in 1999 and 2000. When S.A. was twelve years old, she told her mother
some of the details about what appellant had done to her.

 In May 2006, G.A. called the San Antonio Police Department to report a "sexual
assault" of S.A. Afterwards, Officer Gina Flores went to G.A.'s house and interviewed S.A. 
Officer Flores testified that S.A. told her that the first incident of sexual abuse occurred:

 when the aunt [Salina Fernandez] left, she [S.A.] was called to the bed. She
went to the bed and the suspect [appellant] took her shorts off. And I asked,
"What happened after that?" And she said . . . "That he started to touch me
and he put his finger down there.'" And I asked her, "Where down there?" 
And she said, "In my vagina."

Officer Flores testified that S.A. told her about another incident when appellant "laid her on
the bed and he showed her his penis. . . . [H]e took her shorts off and that's when he held
her down on her shoulders, and . . . he stuck his penis . . . in her vagina." S.A. told Officer
Flores that the sexual abuse stopped when Salina divorced appellant. 

 After Detective Jeffrey Lowder obtained statements from S.A. and G.A., he referred
both of them to the Children's Advocacy Center for ChildSafe ("ChildSafe"). At some point,
appellant spoke to Detective Lowder about the allegations. With respect to this
conversation, Detective Lowder testified that: 

 after I had read the allegations set forth by the victim, I allowed Mr.
Fernandez [appellant] to tell me if he could explain to me the allegations
themselves. And he basically told me he had no explanation why she was
coming forward and making such allegations in regards to the sexual nature
of the case.


During this conversation, appellant never said anything derogatory about S.A., and he
never tried to tell Detective Lowder why he thought S.A. would make these allegations.

 Salina Fernandez testified that appellant permanently moved out of the house in
December 2000 and that she and appellant divorced in 2001. She testified that for the
period of time that S.A. was spending the weekends with them, appellant would stay home
when she left the house for an errand. On cross-examination, she testified that appellant
did not want to "stay home in charge of the kids."

 Dr. Nancy Kellogg, a professor of pediatrics who served as ChildSafe's medical
director, reviewed S.A.'s sexual assault exam, (3) which was performed on June 7, 2006 by
Shirley Menard. (4) When the prosecutor asked Dr. Kellogg to read what S.A. "told the
examiner under the history portion" of the exam, she stated:

 Because they're going to check my privates, my uncle molested me. He
stuck his finger in my privates. He didn't do it once. He did it a lot, like when
my aunt would leave. Wear shorts and he would take them off and my
underwear. He would unzip his pants and show himself. He would hold me
down. Sometimes he would lick me on the front private. He would stick his
penis in me, but not all the way in.


When the prosecutor asked Dr. Kellogg if S.A. "indicate[d] where he [appellant] would stick
his penis in her?", she said, "Her front and back privates." Dr. Kellogg stated that the
physical findings of S.A.'s sexual-assault exam were "normal." However, she testified that
"in cases where we have history of penetration, we have somewhere in the neighborhood
of 85 to 90 percent of those exams are normal." On cross-examination, when defense
counsel asked Dr. Kellogg, "[Y]our findings are consistent with the allegations. In other
words, they could have happened?", she said, "The allegations could have happened. 
Yes, that's the medical opinion."

B. Defense Evidence

 Detective Lowder testified for the defense that S.A. told him "that the first time that
anything happened inappropriately, she was on her aunt's [Salina's] bed while her aunt
was taking a shower[.]" In that incident, appellant picked her up, placed her down, held her
down on the bed, took off her shorts and underwear, placed one of his fingers in her
vagina, and licked her vagina. Detective Lowder stated that the "second thing" S.A.
mentioned to him was an instance when she was in her cousins' room, and appellant was
sitting in a chair. At that time, appellant exposed himself and told S.A. to kiss his penis. 
When Detective Lowder asked S.A. whether anything happened in her cousins' presence,
she responded with two separate incidents. First, while she and her cousins wrestled with
appellant, appellant placed one of his fingers inside of her vagina. Second, "while they
would sit next to each other on the couch in the living room, he [appellant] would place his
hand inside her shorts and digitally penetrate her [S.A.]." She did tell him that appellant
"penetrated her bottom[.]" On cross-examination, he stated that S.A. never "deviate[d]
from the fact that she told [him] that [appellant] abused her with his penis and with his
finger and with his mouth[.]"

 Appellant's son, R.F., (5) testified that he did not recall "wrestling around," "playing
around," or engaging in "horseplay" with S.A. or appellant. He recalled seeing nothing
suspicious between S.A. and appellant.

 Appellant's niece, M.F., (6) testified that in 1997 when she was a young child, appellant
and Salina lived with her for a short time. M.F. stated that appellant never touched her or
did anything inappropriate during that time frame. She visited Salina and appellant at their
home in 1999 and 2000 and never saw any inappropriate behavior.

 M.F.'s sister, P.F., (7) testified that she was four years old in 1997. She remembered
appellant, his wife, and their children staying at the home in which she lived. She did not
remember appellant touching her sexually during that time. 

 Appellant testified that all of the allegations that S.A. made against him were false. 
He testified that he never touched S.A. "in an inappropriate way" and that he never
exposed himself to her.

 On cross-examination, appellant testified that about March 2000, he left the house
where he lived with Salina. When the prosecutor asked him, "Were you ever left alone with
the children, including [S.A.]?", he said, "Yes, ma'am." When asked if he would have been
the only adult with the children, he said, "Sometimes Tony was there and sometimes
Patricia, Salina's sister was there." He testified that his relationship with S.A. was
"relatively close."

II. Discussion


A. Sufficiency of the Evidence 

 In issue one, appellant challenges the factual sufficiency of the evidence to support
his convictions.

 1. Standard of Review

 In a factual-sufficiency review, the only question to be answered is: "Considering
all of the evidence in a neutral light, was a jury rationally justified in finding guilt beyond a
reasonable doubt?" Grotti v. State, 273 S.W.3d 273, 283 (Tex. Crim. App. 2008). 
Evidence can be deemed factually insufficient in two ways: (1) "the evidence supporting
the conviction is 'too weak' to support the fact finder's verdict;" or (2) "considering
conflicting evidence, the fact finder's verdict is 'against the great weight and preponderance
of the evidence.'" Laster v. State, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009) (quoting
Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006)). When a court of
appeals conducts a factual-sufficiency review, it must defer to the jury's findings. Id. The
court of criminal appeals has "set out three 'basic ground rules' implementing this
standard." Id. (quoting Watson, 204 S.W.3d at 414). First, the appellate court must
consider all of the evidence in a neutral light, as opposed to in a light most favorable to the
verdict. Id. Second, the appellate court "may only find the evidence factually insufficient
when necessary to 'prevent manifest injustice.'" Id. (quoting Cain v. State, 958 S.W.2d
404, 407 (Tex. Crim. App. 1997)). Third, the appellate court must explain why the
evidence is too weak to support the verdict or why the conflicting evidence greatly weighs
against the verdict. Id. Although the verdict is afforded less deference during a factual-sufficiency review, an appellate court is not free to "override the verdict simply because it
disagrees with it." Id.

 Our review of a factual sufficiency challenge should be examined under the
principles of review for a hypothetically correct jury charge. Grotti, 273 S.W.3d at 280-81. 
"'Such a charge [is] one that accurately sets out the law, is authorized by the indictment,
does not unnecessarily increase the State's burden of proof, or unnecessarily restrict the
State's theories of liability, and adequately describes the particular offense for which the
defendant was tried.'" Villarreal v. State, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009)
(quoting Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).

 2. Applicable Law-Aggravated Sexual Assault of a Child


 In counts one through six and eight through thirteen, the jury convicted appellant of
twelve counts of aggravated sexual assault of a child. Section 22.021(a) of the penal code
provides, in relevant part, that a person commits the offense of aggravated sexual assault
of a child if the person: 

 (B) intentionally or knowingly:


 (i) causes the penetration of the anus or sexual organ of a child
by any means;


 (ii) causes the penetration of the mouth of a child by the sexual
organ of the actor;


 (iii) causes the sexual organ of a child to contact or penetrate the
mouth, anus, or sexual organ of another person, including the
actor;


 (iv) causes the anus of a child to contact the mouth, anus, or
sexual organ of another person, including the actor; or


 (v) causes the mouth of a child to contact the anus or sexual
organ of another person, including the actor; and


 (2) if:


 * * *


 (B) the victim is younger than 14 years of age. . . .


Tex. Penal Code Ann. § 22.021(a)(1)(B)(i)-(v), (2)(B). The testimony of a child victim alone
is sufficient to support a conviction for aggravated sexual assault of a child. Perez v. State,
113 S.W.3d 819, 838 (Tex. App.-Austin 2003, pet. ref'd); see Tex. Code Crim Proc. Ann.
art. 38.07 (Vernon 2005); Tear v. State, 74 S.W.3d 555, 560 (Tex. App.-Dallas 2002, pet.
ref'd). 

 a. Counts Three, Four, Ten, & Eleven

 To prove counts three and ten as set forth in the charge, the State was required to
establish beyond a reasonable doubt that appellant "did intentionally or knowingly cause
the penetration of the female sexual organ of [S.A.], a child who was younger than 14
years, by [appellant's] male sexual organ, . . . ." To prove counts four and eleven as set
forth in the charge, the State was required to establish beyond a reasonable doubt that
appellant "did intentionally or knowingly cause the female sexual organ of [S.A.], a child
who was younger than 14 years, to contact the male sexual organ of [appellant], . . . ." 

 S.A. testified that on one occasion, appellant took off her shorts and underwear and
that she saw his erect penis. She stated that appellant "placed it in my vagina, but he
didn't place it all the way in where it could hurt." When the prosecutor asked S.A. how
many times she recalled appellant placing his penis in her vagina, she said, "More than five
times." Based upon S.A.'s testimony, a rational jury could reasonably conclude that while
S.A. was younger than fourteen years of age, appellant (1) caused the penetration of
S.A.'s female sexual organ by his male sexual organ on at least two occasions and (2)
caused S.A.'s female sexual organ to contact his male sexual organ on at least two
occasions.

 b. Counts One, Two, Eight, & Nine

 To prove counts one and eight as set forth in the charge, the State was required to
establish beyond a reasonable doubt that appellant "did intentionally or knowingly cause
the penetration of the anus of [S.A.], a child who was younger than 14 years, by
[appellant's] male sexual organ, . . . ." To prove counts two and nine as set forth in the
charge, the State was required to establish beyond a reasonable doubt that appellant "did
intentionally or knowingly cause the anus of [S.A.], a child who was younger than 14 years,
to contact the male sexual organ of [appellant], . . . ."

 When the prosecutor asked S.A. "[c]an you tell us if he [appellant] ever placed his
penis anywhere else?", she said, "Yes. In my bottom." When asked if she was "familiar
with the word anus," she said that she was. And, when the prosecutor asked her, "Is that
the area you're talking about?", she said, "Yes." She testified that while she and appellant
were in Salina's bedroom, "[m]y shorts were off and my underwear were off, and he had
turned me over and he was putting his penis in my bottom, and then he stopped, like he's
always stopped." When asked what she meant by "he always stopped," she said, "Like he
would put it in, but he wouldn't put it all the way to where it would hurt. And I felt that it was
wet and he was up." She said that the "wetness" came from his penis and that when she
said that "'he was up,'" she meant "that his penis was erect."

 Regarding the number of times this conduct occurred, we note that the prosecutor,
before questioning S.A. about appellant putting his penis in her anus, had questioned S.A.
about the number of times that appellant put his penis in her vagina. When the prosecutor
asked S.A. how many times appellant put his penis into her vagina, she said, "More than
five times." After the prosecutor finished this line of questioning, he began questioning her
about the incidents when appellant put his penis in her anus. When the prosecutor asked
her how many times that happened, she said, "It was less than the other times" but "more
than one time." By "other times" she was referring to the number of times appellant put his
penis in her vagina, which was "[m]ore than five times." Based upon S.A.'s testimony, a
rational jury could reasonably conclude that while S.A. was younger than fourteen years
of age, appellant (1) caused his sexual organ to penetrate S.A.'s anus on at least two
occasions and (2) caused S.A.'s anus to contact his male sexual organ on at least two
occasions.

 c. Counts Five and Twelve

 To prove counts five and twelve as set forth in the charge, the State was required
to establish beyond a reasonable doubt that appellant "did intentionally or knowingly cause
the penetration of the female sexual organ of [S.A.], a child who was younger than 14
years, by [appellant's] finger, . . . ." S.A. testified that while she and her cousins were
laying on a bed with the covers over them, appellant came into the bedroom and "put his
finger in my vagina." She moved away from him, and he left the room. On another
occasion, she and appellant were in a bedroom while appellant slept on the bed. Her
cousins were also in this bedroom, playing video games. She testified that while she sat
on the bed, appellant "woke up and . . . like, put his hand in my shorts and he had put his
finger in my vagina, and it hurt so I moved away and I got up." She recounted another
incident when her cousins were outside the house and Salina was at HEB. She said that
as she walked into Salina's bedroom, appellant pulled down her shorts and underwear and
started "putting [his fingers] in my privates." By "privates" she meant her "vagina area." 
She testified that she could feel his fingers inside of her vagina. When the prosecutor
asked her, "How many times did he do that to you?", she said, "Well, that exactly, probably
a couple of times." She also testified that "[i]t would sometimes happen in my cousins'
room." When the prosecutor asked her to "[t]ell us about the time that it happened in your
cousins' room[,]" she said that appellant was sitting in a rocking chair, watching TV. While
she sat on his lap, facing him, "he put his fingers in [her] vagina area." She testified that
she felt his fingers inside of her vagina. When the prosecutor asked her, "Besides these
two times, did he ever put his finger in your vagina area as you described?", she said,
"Yes." However, she could not remember how many times this happened. When the
prosecutor asked her, "Could it be more than ten or less than ten?", she said, "More than
five." Based upon S.A.'s testimony, a rational jury could reasonably conclude that while
S.A. was younger than fourteen years of age, appellant on at least two occasions caused
the penetration of S.A.'s female sexual organ by his finger. 

 d. Counts Six and Thirteen

 To prove counts six and thirteen as set forth in the charge, the State was required
to establish beyond a reasonable doubt that appellant "did intentionally or knowingly cause
the female sexual organ of [S.A.], a child who was younger than 14 years, to contact the
mouth of [appellant], . . . ." When the prosecutor asked S.A. if appellant had ever touched
her with any other part of his body, she said, "His mouth." She testified that appellant
"would put it on my vagina." She stated that he did this "[m]ore than five times" while she
was on Salina's bed. When the prosecutor asked if she "remember[ed] how . . . he put his
mouth on your vagina?", she said he "would put his mouth and he would start licking me,
. . . ." Based upon S.A.'s testimony, a rational jury could reasonably conclude that while
S.A. was younger than fourteen years of age, appellant on at least two occasions caused
S.A.'s female sexual organ to contact his mouth.

 3. Applicable Law-Indecency With a Child by Exposure


 In counts seven and fourteen, the jury convicted appellant of two counts of
indecency with a child by exposure. Section 21.11 of the penal code provides that a
person commits the offense of indecency with a child by exposure "if, with a child younger
than 17 years of age, . . . the person: . . . (2) with intent to arouse or gratify the sexual
desire of any person: (A) exposes the person's anus or any part of the person's genitals,
knowing the child is present: . . . ." Tex. Penal Code Ann. § 21.11(a)(2)(A); see
Breckenridge v. State, 40 S.W.3d 118, 128 (Tex. App.-San Antonio 2000, pet. ref'd). A
fact finder can infer the requisite, specific intent to arouse or gratify the sexual desire of any
person "from the defendant's conduct, remarks, and all surrounding circumstances." Id.
(citing McKenzie v. State, 617 S.W.2d 211, 216 (Tex. Crim. App. 1981)). The testimony
of a child victim alone is sufficient to support a conviction for indecency with a child. Perez,
113 S.W.3d at 838; see Tex. Code Crim Proc. Ann. art. 38.07; Tear, 74 S.W.3d at 560. 
 To prove counts seven and fourteen as set forth in the charge, the State was
required to establish beyond a reasonable doubt that appellant "did, with the intent to
arouse or gratify the sexual desire of any person, expose part of his genitals, knowing that
[S.A.] a female child younger than seventeen (17) years and not the spouse of [appellant]
was present, . . . ." 

 S.A. testified that on one occasion while her cousins played video games in the
living room, she was lying on the edge of Salina's bed. She stated that appellant took off
her shorts and underwear and that she saw his erect penis. She stated that on another
occasion, she and appellant were in the living room, playing. During this encounter, she
said he "had his penis out" and asked her to kiss it. She refused and turned her head
away. When the prosecutor asked her, "Do you remember at that time when he had his
penis out, whether it was erect, whether it was up?", she said, "Yes, I remember . . . ." 
Based upon S.A.'s testimony, a rational trier of fact could find beyond a reasonable doubt
that appellant on at least two occasions, while knowing that S.A., a child younger than
seventeen years of age and not his spouse was present, exposed part of his genitals to
her with intent to arouse or gratify sexual desire.

 In challenging the factual sufficiency of the evidence, appellant contends: (1) S.A.
was the only witness to testify that the sexual abuse occurred; (2) both Salina Fernandez
and her son, R.F., who were present when S.A. stayed the weekends at their house, never
"saw or perceived anything unusual" occur between S.A. and appellant; (3) there was no
physical evidence that any sexual assaults occurred; (4) S.A. told Detective Lowder that
the first time that appellant sexually abused her was when Salina was in the shower;
however, S.A. told Officer Flores that it happened when Salina left the house to run
errands; (5) appellant never threatened S.A. or told her anything "during most of the
episodes despite the fact that his sons were present and on occasion his wife," Salina; (6)
S.A.'s father would sometimes stay with S.A. at the home of Salina and appellant; (7)
Salina testified that when S.A. stayed at her home, she "appeared" happy, well-adjusted,
and never tried to hide from appellant; (8) Salina testified that appellant did not like staying
at home with the kids "and would sometimes" do the errands and go to H.E.B.; (9) Salina's
son, R.F., never saw anything suspicious or inappropriate between S.A. and appellant; (10)
S.A.'s sexual-assault exam was normal; (11) appellant denied that he had ever exposed
his genitals to S.A.; and (12) appellant denied that he had ever touched S.A. in a sexual
manner or in any inappropriate manner. Initially, we note that the jury is the sole judge of
the credibility of the witnesses and the weight to be given the evidence, and may choose
to believe all, some, or none of it. Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979);
Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000); Rachal v. State, 917
S.W.2d 799, 805 (Tex. Crim. App. 1996). Thus, the jury is permitted to believe or
disbelieve any part of the testimony of any witness. Jones v. State, 984 S.W.2d 254, 258
(Tex. Crim. App. 1998); Perez, 113 S.W.3d at 838. "Reconciliation of evidentiary conflicts
is solely a function of the trier of fact". Perez, 113 S.W.3d at 838 (citing Losada v. State,
721 S.W.2d 305, 309 (Tex. Crim. App. 1986)). The jury could have accepted that portion
of S.A.'s testimony as sufficient to support the convictions and disregarded the
inconsistencies. "A decision is not manifestly unjust because the jury resolved the
manifestly conflicting views of the evidence in favor of the State." Cain, 958 S.W.2d at
409.

 Viewing all of the evidence neutrally, we conclude that the evidence supporting the
convictions is not so weak that the jury's determinations are clearly wrong and manifestly
unjust, or that the verdict is against the great weight and preponderance of the evidence. 
We, therefore, hold that the evidence is factually sufficient to support the convictions for
indecency with a child by exposure and for aggravated sexual assault of a child. Issue one
is overruled.

B. Jurisdiction

 In issues two through five, appellant challenges this Court's jurisdiction over his
appeal. He contends that chapter 73 of the Texas Government Code violates the Equal
Protection Clause of the United States Constitution, because it does not give proper effect
to the voters of Texas who elect the justices of the intermediate appellate courts. See U.S.
Const. amend. XIV.; Tex. Gov't Code Ann. § 73.001 (Vernon 2005). He also argues that
this Court lacks jurisdiction over his appeal because the Texas Supreme Court's order of
transfer is unconstitutional under the Texas Constitution due to a conflict between the
Texas Constitution and chapter 73 of the Texas Government Code. He further argues that
this Court lacks jurisdiction over his appeal because the order of transfer violates the Equal
Protection and Due Course of Law provisions of the Texas Constitution and is a void
exercise of legislative authority over the judiciary in violation of the Separation of Powers
provision contained in article II, section 1 of the Texas Constitution. See Tex. Const. art.
II § 1. He requests that we transfer this appeal back to the Fourth Court of Appeals.

 The Texas Supreme Court may transfer cases to this Court, pursuant to section
73.001 of the Texas Government Code, "at any time that, in the opinion of the supreme
court, there is good cause for transfer." Tex. Gov't Code Ann. § 73.001. (8) Section 73.002
of the government code provides that the transferee court of appeals "has jurisdiction of
the case without regard to the district in which the case originally was tried and to which
it is returnable on appeal." Tex. Gov't Code Ann. § 73.002. Appellant argues his
constitutional issues as challenges to our jurisdiction. Generally, a party is not required to
preserve a challenge to the court of appeals' jurisdiction. See; e.g., Arocha v. State, No.
08-07-00108-CR 2009 WL 1883733, at *5 (Tex. App.-El Paso June 30, 2009) (mem op.)
(not designated for publication); pet. dism'd improvidently granted, 2010 WL 2618421 (Tex.
Crim. App. June 30, 2010). However, the Eighth Court of Appeals in Arocha concluded
that constitutional jurisdictional challenges such as this must be preserved, because
"[e]ven if section 73.001 is unconstitutional as applied to [Arocha], we would not be
divested of jurisdiction" under section 73.002. Id. 

 The proper procedure for obtaining a transfer between appellate courts is by motion
to the Texas Supreme Court. See Tex. Gov't Code Ann. § 73.001. The Texas Supreme
Court has established the following procedure for a transfer:

 The party requesting transfer should file a copy of the motion to
transfer in each of the two courts of appeals, asking that, when the motion
is forwarded to the Supreme Court, each court of appeals advise the
Supreme Court in writing whether it has any objection to the proposed
transfer. Any briefs in favor of the proposed transfer should also be filed in
each court of appeals and forwarded with the transfer motion. We will then
have the motion, the briefs, and the comments of the two courts of appeals
in determining whether to grant the motion to transfer.

 

Id. (citing Miles v. Ford Motor Co., 914 S.W.2d 135, 137 n.2 (Tex. 1995)). Failure to follow
the established procedure results in failure to preserve complaints about the transfer of an
appeal. See id. 

 If appellant had followed the required procedure by filing a motion to transfer, his
complaints about the constitutionality of section 73.001 would be remedied. Id. 
Alternatively, if his motion to transfer was denied, this Court would be in a position to
address the constitutional issues. Id. We conclude appellant did not follow the proper
procedure requesting transfer, and therefore, his complaint is not preserved. We overrule
issues two through five.

III. Conclusion


 We affirm the trial court's judgment. 


 ROSE VELA 

 Justice



Do not publish.

Tex. R. App. P. 47.2(b).


Delivered and filed the

19th day of August, 2010.
1. This appeal was transferred to this Court from the Fourth Court of Appeals by order of the Texas
Supreme Court. See Tex. Gov't Code Ann. § 22.220 (Vernon 2004) (delineating the jurisdiction of appellate
courts); Tex. Gov't Code Ann. § 73.001 (Vernon 2005) (granting the supreme court the authority to transfer
cases from one court of appeals to another at any time that there is "good cause" for the transfer).
2. Because the complainant, S.A., is a minor, we will refer to her by her initials. We will also refer to
her mother by her initials to protect her privacy.
3. The trial court admitted S.A.'s sexual-examination report into evidence as State's exhibit 3.
4. Dr. Nancy Kellogg testified that Shirley Menard, a nurse practitioner, worked at ChildSafe for about
eight years and retired in 2007 "with medical issues." Menard did not testify in this case. 
5. At the time of trial, R.F. was a minor.
6. At the time of trial, M.F. was a minor.
7. At the time of trial, P.F. was a minor.
8. See also Arocha v. State, No. 08-07-00108-CR 2009 WL 1883733, at *4 (Tex. App.-El Paso June
30, 2009), (mem op.) (not designated for publication); pet. dism'd improvidently granted, 2010 WL 2618421
(Tex. Crim. App. June 30, 2010). In Arocha, the Court of Criminal Appeals granted discretionary review to
determine whether the Eighth Court of Appeals erred in rejecting Arocha's jurisdictional arguments on the
basis of a procedural default, however, upon reviewing the record, it concluded that granting Arocha's petition
was improvident. Arocha v. State, (No. PD-1189-90) 2010 WL 2618421 (Tex. Crim. App. June 30, 2010).